UNITED STATES of America

v.

Nicholas ALOI, Michael Dattero, Joseph DeCicco, Louis DiFazio, Murray Edelstein, Edward Fischman, Seymour Frank, Charles Glazer, Arthur Gudeon, Theodore Hali, Selwynn Schenkman, Allen Shuman and John Valente, Defendants.

No. 77 CR 77.

United States District Court,
E. D. New York.

Dec. 21, 1977.

David G. Trager, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., for the United States of America by Edward R. Korman, Chief Asst. U. S. Atty., Richard S. Berne, Stanley Marcus, Asst. U. S. Attys., Samuel H. Dawson, Deputy Chief Asst. U. S. Atty., Brooklyn, N. Y.

Barry Ivan Slotnick, New York City, for defendant Joseph DeCicco.

Theodore T. Jones, Brooklyn, N. Y., for defendant Louis DiFazio.

Joseph J. Marcheso, New York City, for defendant Seymour Frank.

William J. Cunningham, Buffalo, N. Y., for defendant Edward Fischman.

Joseph W. Ryan, Jr., Mineola, N. Y., for defendant Charles Glazer.

Saxe, Bacon & Bolan, P. C., New York City, for defendant Theodore Hali, Roy M. Cohn, Michael Rosen, Ronald F. Poepplein, New York City, of counsel.

Segal & Hundley, New York City, for defendant John Valente, Marvin G. Segal, New York City, of counsel.

## MEMORANDUM AND ORDER

BRAMWELL, District Judge.

### FACTS

The within matters are before this Court by way of various defendant motions to dismiss the underlying indictment. This indictment rests upon facts which can be briefly summarized as follows.

In 1975, in the wake of a major fiscal crisis, the State of New York sought ways to improve the financial stability of the State. One such measure utilized was a review of the New York State Medicaid Program [1] which was enacted and is partially funded pursuant to the Federal Medical Assistance Program.[2] During this review by the New York State Legislature, a proposal was made which advocated elimination of various optional medicaid services from the state program. Among such services contemplated to be excised from medicaid funding were podiatric services.[3] At the time this proposal was under legislative consideration, a joint state and federal investigation uncovered a scheme whereby certain persons allegedly sought to illegally influence officials of New York's Executive and Legislative branches not to eliminate podiatric services from New York's Medicaid Program. This scheme ostensibly included an attempt to bribe a New York public official in order to influence his decision to secure the future federal and state funding of podiatric services.[4] The defend-

---

1. N.Y.Soc.Serv. Law § 363 *et seq.* (McKinney's 1971).

2. 42 U.S.C. § 1396 *et seq.* 1970, *as amended* 42 U.S.C. § 1396 *et seq.* (Supp. V 1975).

3. Podiatric services are an optional medicaid service under the Federal Medical Assistance Program. 42 U.S.C. § 1396d (1970), *as amended* 42 U.S.C. § 1396d (Supp. V 1975). New York included podiatric services in its regional plan. N.Y.Soc.Serv.Law § 365 -a(2)(a) (McKinney's 1971).

4. Retention of podiatric services in the state's medicaid program would result in New York podiatrists being the continued recipients of federal funds. The Department of Health, Education and Welfare has calculated that in the calendar year of 1975, federal expenditures for podiatric services totaled $4,700,000. For 1976, expenditures totaled $4,900,000. Government's Memorandum in Opposition to Motions of Several Defendants to Dismiss the Indictment and for Other Relief at 8 n. 22.

ants herein are alleged to have participated in this scheme.[5]

## THE INDICTMENT

On February 9, 1977 a two count indictment was handed up which charged the defendants [6] with numerous violations of federal law.[7] Under Count One of the indictment, all thirteen defendants are charged with conspiracy to defraud the United States in violation of section 371 of Title 18 of the United States Code.[8] More specifically, Count One alleges that the defendants conspired to defraud the federal government in connection with the performance of its lawful governmental functions by obstructing and hindering the Department of Health, Education and Welfare (hereinafter HEW) from properly administering and distributing federal funds pursuant to the Medical Assistance Program and,

furthermore, by depriving the government of the faithful and honest participation of the State of New York in the Medicaid program. As part of the conspiracy, it is alleged that the defendants agreed to defraud the United States of its right to have federal funds distributed fairly and impartially and of its right to have New York Executive and Legislative officials render an impartial and honest decision regarding the proposal to eliminate podiatric services from the state's Medicaid program. As a further part of this conspiracy, Count One claims that the defendants agreed to raise $100,000 to be used to bribe a public official of New York in order to influence his decision with respect to the legislative proposal then under consideration.[9]

Count Two of the indictment charges four of the defendants [10] with violations of Sections 2 [11] and 1952 [12] of Title 18 of the

---

5. While the state legislature enacted substantial modifications in the medicaid program, the proposal to eliminate podiatric services was defeated. In 1977, the legislature eliminated podiatry from the State's Medicaid Program. *Id.* at 9 n. 23; New York Times, April 1, 1977, at A12, col. 3.

6. The defendants in this case are the following parties: Nicholas Aloi, Michael Dattero, Joseph DeCicco, Louis DiFazio, Murray Edelstein, Edward Fischman, Seymour Frank, Charles Glazer, Arthur Gudeon, Theodore Hali, Selwynn Schenkman, Allen Shuman and John Valente. All defendants except DeCicco and DiFazio are podiatrists maintaining offices in the State of New York. Defendant Edelstein was also President of the New York College of Podiatric Medicine.

7. Defendants were also indicted in New York State for the crimes of attempted bribery in the second degree and conspiracy to commit bribery in violation of §§ 200.00 and 105.05 of the New York State Penal Law. Some of the defendants have already pleaded guilty to the state charges.

8. 18 U.S.C. § 371 (1970) provides in pertinent part:

If two or more persons conspire . . . to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

9. The indictment lists thirty-five overt acts done in furtherance of the conspiracy including the solicitation and collection of funds, telephone conversations between the various defendants and the admission of a previously rejected applicant to the New York College of Podiatric Medicine in return for monies from said applicant's father.

10. The four defendants charged in Count Two of the indictment are Joseph DeCicco, Louis DiFazio, Theodore Hali and John Valente.

11. 18 U.S.C. § 2 (1970) provides:
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

12. 18 U.S.C. § 1952 (1970) provides in part:
 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
 (1) distribute the proceeds of any unlawful activity; or
 (2) commit any crime of violence to further any unlawful activity; or
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
 and thereafter performs or attempts to perform any of the acts specified in subpara-

United States Code in that they allegedly employed facilities in interstate commerce to commit the crime of bribery in violation of Section 200.00 of the New York State Penal Law.

The defendants, individually and in conjunction, have raised various objections to the instant indictment. As to Count One, the defendants contend that the offense charged fails to state a cognizable offense under the laws of the United States, that it fails to allege the essential elements of a conspiracy to defraud the United States, and is impermissibly vague in that it omitted to name the public official who allegedly was to be bribed.

The defendants who are charged under Count Two of the indictment further attack the indictment as being legally insufficient on the ground that Count Two does not adequately allege the essential elements of a violation of section 1952 of Title 18 of the United States Code. These defendants further contend that Count Two contains insufficient allegations of interstate activity to establish a violation of section 1952.

Finally, all of the defendants seek a dismissal of the indictment on the ground that it violates the Federal Wiretap Statute, 18 U.S.C. § 2510 et seq. (1970). Relying on the Second Circuit's decision in *United States v. Marion*, 535 F.2d 697 (2d Cir. 1976), the defendants argue that certain wiretap and eavesdropping evidence obtained during the joint investigation was submitted to the federal grand jury in violation of section 2517(5) of Title 18 of the United States Code. The defendants thus conclude that the indictment must be dismissed.

In the alternative to dismissal of the entire indictment or a particular count contained therein, four of the defendants move for suppression of all wiretap conversations in which they were involved on various grounds including failure to name said defendant in the wiretap order, failure to promptly amend said orders to include unrelated crimes, failure to promptly seal the intercepted conversations, and failure to properly minimize. Furthermore, defendant DeCicco moves for inspection of the Grand Jury minutes. Finally, several of the defendants have also moved for severance.

## DEFENDANTS' MOTION TO DISMISS COUNT ONE OF THE INDICTMENT

Count One of the indictment charges the defendants with conspiracy to defraud the United States in violation of section 371 of Title 18. As previously noted, the defendants have interjected a variety of contentions which they argue necessitate a dismissal of this count.

■ The defendants' primary contention is that Count One fails to set forth a cognizable offense against the United States. This contention is predicated on a variety of arguments. First, the defendants contend that the decision whether to eliminate podiatric services from the New York State Medicaid Program was wholly within the jurisdiction of the Executive and Legislative branches of New York. The defendants then point out that no federal agency or public official was directly involved in this decision, and, thus, no federal offense could have been committed. The defendants also maintain that the functions and administration of HEW are separate and independent from any action taken by state officials. Furthermore, the defendants argue that no federal interest was involved which could be defrauded since no legal relationship or responsibility existed between the state officials and HEW with respect to the proposed legislation. Finally, the defendants claim that no official act of a public servant was to be illegally influ-

---

graphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or controlled substances (as defined in section 120(6) of the Controlled Substances Act) or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

enced and that no federal funds were either diverted or dependent on the outcome of the proposed legislation. After careful consideration of all of these arguments advanced by the defendants, the Court finds them to be without merit.

To begin with, it appears that the defendants have misconstrued the meaning of the conspiracy to defraud clause of section 371 of Title 18. Furthermore, it appears that the defendants have failed to perceive the pervasive involvement of the federal government in New York State's Medicaid Program. Consequently, the defendants have failed to recognize the vital interest that the federal government has in maintaining the integrity of a state program.

Turning first to the issue of whether the acts alleged in Count One of the indictment fall within the terms of the conspiracy to defraud clause of section 371 of Title 18, it is necessary to initially examine the seminal decision of *Hammerschmidt v. United States*, 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924), which analyzed the nature and meaning of this clause. In this case, the Supreme Court stated:

> conspir[acy] to defraud the United States means primarily to cheat the government out of property or money, but it also means *to interfere with or obstruct one of its lawful governmental functions* by deceit, craft or trickery, *or at least by means that are dishonest*. It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that *its official action and purpose shall be defeated* by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention.

*Id.* at 188, 44 S.Ct. at 512 (emphasis supplied). Here, there can be no question that the alleged conspiracy encompassed a "means that [is] dishonest" and that the result impairs, obstructs, and defeats the lawful functions of HEW, and thus the United States. *See United States v. Johnson*, 383 U.S. 169, 172, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966); *Haas v. Henkel*, 216 U.S. 462, 479, 30 S.Ct. 249, 54 L.Ed. 569 (1910).

Even the briefest reading of the Medical Assistance Program created by subchapter XIX of the Social Security Act of 1935, 42 U.S.C. § 1396 *et seq.* (1970), *as amended* 42 U.S.C. § 1396 *et seq.* (Supp. V 1975), clearly shows the close relationship which exists between the federal government through HEW and the State of New York. *Cf. United States v. Beasley*, 550 F.2d 261 (5th Cir. 1977). HEW was and is involved in the planning, establishment, maintenance and revision of the New York Medicaid Program. For example, the Act establishes minimum standards for the medicaid programs of participating states which must be met before a state program receives federal funds. 42 U.S.C. § 1396 *et seq.* (1970), *as amended* 42 U.S.C. § 1396 *et seq.* (Supp. V 1975). Once a plan is adopted by a state, the Secretary of HEW must approve the plan based upon relevant federal statutes and regulations. 45 C.F.R. §§ 201.2, 201.3 (1976). After such an approval, the federal government is obligated to expend federal funds to pay a percentage of the cost of the state program. *See* 42 U.S.C. § 1396b (1970), *as amended* 42 U.S.C. § 1396b (Supp. V 1975).[13]

13. Among the expenditures covered by the federal grant are medical and hospital costs, administrative costs, personnel training and claims processing costs. *See* 42 U.S.C. § 1396b (1970), *as amended* 42 U.S.C. § 1396b (Supp. V 1975). The amount of federal funding is determined in a two-step process. First, at quarterly intervals the state is required to transmit to HEW, on approved forms, a quarterly estimate of its medicaid expenditures. 42 U.S.C. § 1396b(d)(1) (Supp. V 1975); 45 C.F.R. § 201.-5(a)(1) (3) (1976). These estimates are analyzed by regional officials of HEW and then forwarded to Washington where the grant is computed. 45 C.F.R. § 201.5(b) (1976). Thereafter, a grant award notice is sent to the state indicating the amount of estimated expenditures for the ensuing quarter. As costs are then incurred, the state may draw against this award for the federal share of disbursements. 45 C.F.R. § 201.5(c) (1976). To facilitate this draw, the federal government files with a federal reserve bank, a letter of credit to the state's benefit. *Id.* It should be noted that contrary to the defendant Frank's assertion, the computation of the quarterly estimate by the Secre-

Moreover, comprehensive review of the state program is mandated by federal statute. *See* 45 C.F.R. § 201.10(a) and (c) (1976). If a state is found in non-compliance with the federal statute, federal funds can be withheld, 42 U.S.C. § 1396c (1970); 45 C.F.R. § 201.6 (1976). Any revision of or amendment to a state plan must be reviewed by HEW and approved by the Secretary. 42 U.S.C. § 1396a (1970), *as amended* 42 U.S.C. § 1396a (Supp. V 1975); 45 C.F.R. § 201.3 (1976). Finally, the Secretary is empowered to promulgate regulations which are necessary for the proper and efficient operation of state plans. 45 C.F.R. § 205.30 (1976).

■ Thus, while it is true that the Act gives the states "considerable discretion and latitude in devising their Medicaid Plans," *District of Columbia Podiatry Society v. District of Columbia*, 407 F.Supp. 1259, 1263 (D.D.C.1975), the Act envisages a "scheme of cooperative federalism," *Doe v. Beal*, 523 F.2d 611, 616 (3d Cir. 1975) (en banc). To say that no federal interest is involved or that no federal agency action was dependent on state action totally misconceives the nature and purpose of Medicaid. *Cf. Beasley, supra* at 270–71.

Count One of the indictment specifically charges the defendants with conspiring to defraud the federal government by obstructing and hindering HEW from properly administering and distributing federal funds pursuant to the Medical Assistance Program and of depriving the federal government of New York's honest participation in this program. As stated in the applicable statute, this program was enacted

> [f]or the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services . . . [T]here is hereby authorized to be appro-

priated for each fiscal year a sum sufficient to carry out the purposes of this subchapter [which] shall be used for *making payments to States which have submitted, and had approved by the Secretary of Health, Education, and Welfare, State plans for medical assistance.*

42 U.S.C. § 1396 (Supp. V 1975) (emphasis supplied). It is therefore clear that the conspiracy charged in Count One would enable the defendants to continue as recipients of federal medicaid funds and thus had the effect of hindering and obstructing a lawful and highly meritorious federal program. Moreover, it had the effect of depriving the federal government of New York's impartial and honest participation in the federal program. The success of the alleged conspiracy would render it improbable that an unbiased decision would be made as to elimination or retention of podiatric services in the New York Program. A federal interest was, therefore, directly implicated. *See Beasley, supra; United States v. Del Toro*, 513 F.2d 656 (2d Cir.), *cert. denied*, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975); *United States v. Sweig*, 316 F.Supp. 1148, 1155–56 (S.D.N.Y.1970), *aff'd*, 441 F.2d 114 (2d Cir.), *cert. denied*, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971).

Turning next to the defendants' argument that no official act of a federal public servant was to be corruptly influenced and that no relationship existed between the state officials and HEW, it is apparent that the defendants fail to recognize the responsibility lodged in the state officials with respect to the proposed legislation. *United States v. Johnson*, 337 F.2d 180 (4th Cir. 1964), *aff'd*, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), involved an indictment which charged various defendants, including two Congressmen, with conspiracy to defraud the United States. As part of the conspiracy, Congressmen were paid to speak in Congress and to persuade officials of the Justice Department to postpone and ultimately dismiss criminal actions pending

tary and the transmittal of the grant award notice to the state, obligates federal funds for

payment to the state. *See* 42 U.S.C. § 1396b(d)(4) (1970).

against one of the defendants therein. In holding that the indictment was not defective, and in relying on *Hammerschmidt*, the Court noted that the government had the right not to have official business of the Department of Justice interfered with and obstructed. Similarly, the Court found that the government also had a right to have Congressmen free from corruption and not to be deprived of their faithful, loyal and conscientious services. *Id.* 337 F.2d at 184–86. Though the convictions of the Congressmen were reversed given their Congressional privilege, *id.* at 186–92, judgment as to the individual defendants was affirmed, *id.* at 192. While state legislators are involved herein, the Court finds *Johnson* to be highly persuasive in viewing the instant indictment. Here, the alleged conspiracy had the effect of interfering with the lawful and proper administration of HEW rather than the Department of Justice. Similarly, the government was deprived of the faithful, loyal and conscientious services of officials, although they were state rather than federal, who were charged with a duty of administering a state program that is inextricably entwined with the federal program. Moreover, state officials were to be influenced through a bribe, a means that is dishonest. *Id.* at 186. Thus, the revision of the Medicaid Program had a direct effect on the federal government, which was equally as direct as that resulting from the alleged corruption in the Justice Department.

Also on point is the recent Second Circuit decision of *United States v. Del Toro*, 513 F.2d 656 (2d Cir.), *cert. denied*, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). There, the defendants planned to bribe an employee of the New York City Model Cities Program which was funded and supervised in large part by the Department of Housing and Urban Development (HUD). In affirming the defendant's conviction for violation of the conspiracy to defraud clause of section 371, the Court stated: "[a]n agreement that *might* defraud the federal government in its functions *at sometime in the future*" was sufficient to support a conspiracy to defraud. *Id.* at 664 (emphasis supplied). This was true despite the fact that the relationship between the city official and HUD was at best somewhat tenuous. *Id.* at 662–63. After stating that the essence of the conspiracy was the corrupt agreement to defraud the United States, the Court further noted that as to this charge, the official did not have to be a federal public official. *Id.* at 663.[14] Moreover, the Court held that the government has the right to expect the "unprejudiced judgment" of the city official and that any conspiracy to corruptly influence that official would "to some extent . . . subvert the Model Cities Program, and hence the objectives of the United States . . .." *Id.* at 663–64 n. 4.[15] Of similar import was the decision in *Harney v. United States*, 306 F.2d 523 (1st Cir. 1962), where the Court stated that

> it is enough to show a scheme whereby through fraud federal funds in normal course [are] diverted from their true and lawful object. . . .

*Id.* at 531.

No lesser effect would have resulted here by the successful completion of the alleged conspiracy. The government had the right to expect that New York's decision to continue Medicaid funds for podiatric treatment would not be connected or influenced by a bribe.[16] The conspiracy had

---

**14.** The Court in fact held that the city official was not a federal public official within the meaning of 18 U.S.C. § 201, 513 F.2d at 662–63, but that this fact was irrelevant for conviction under the conspiracy to defraud clause of § 371. *Id.* at 663–64.

**15.** *Del Toro* thus indicates that it is not necessary for federal government officials to be recipients of the bribe. *Id.*

**16.** The defendants further argue that since podiatric services are optional under the federal scheme, 42 U.S.C. § 1396d (1970) *as amended* 42 U.S.C. § 1396d (Supp. V 1975); 45 C.F.R. § 249.10 (1976), the federal government had absolutely no interest in this aspect of the New York program or in the proposed decision of the State legislature. Such a contention is without merit. Podiatric services can be and were part of the state Medicaid Program. The federal government was thus entitled to a free and honest decision as to its inclusion or exclusion.

the direct and immediate effect of "subverting" the Medicaid Program, and, thus, the objectives of the United States. Moreover, the decision to continue such services had the direct effect of committing federal funds in the future, thereby diverting the funds "from their true and lawful object." *See also Beasley, supra; United States v. Thompson,* 366 F.2d 167 (6th Cir. 1966); *Harney, supra; United States v. Sweig,* 316 F.Supp. 1148 (S.D.N.Y.1970), *aff'd,* 441 F.2d 114 (2d Cir.) *cert. denied,* 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971).

As to the defendants remaining contentions regarding Count One, the Court finds them unavailing. As to defendants' contention that the indictment does not state the elements of a conspiracy to defraud, a simple reading of the indictment reveals that these elements are stated. *See Roberts v. United States,* 416 F.2d 1216, 1220 (5th Cir. 1969); *Cross v. United States,* 392 F.2d 360, 362 (8th Cir. 1968). Thus, the indictment adequately apprises the defendants of the nature of the crime charged.

The defendants further argue that Count One merely charges a conspiracy to commit bribery in violation of New York law and is thus insufficient for the following related reasons. They claim, first, that it fails to set forth the elements of bribery under New York law; second, that it fails to name the public servant to be bribed; and finally, that it fails to allege that the defendants sought to influence a public servant in his official capacity or that said official had authority to act on Medicaid matters.

■ Even the most casual reading of the indictment indicates that Count One does not charge as a substantive offense the giving of bribes, nor does it charge a conspiracy to give bribes. Instead, Count One charges an explicit conspiracy to defraud the United States, "the scheme of resorting to bribery being averred only to be a way of consummating the conspiracy." *United States v. Manton,* 107 F.2d 834, 839 (2d Cir.

1938), *cert. denied,* 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940). Conspiracy to defraud the federal government is prohibited by section 371 and can be violated without reference to whether the crime is consummated, *Del Toro, supra* 513 F.2d at 663–64, or whether the state law has also been violated, *Beasley, supra* 550 F.2d at 271. The indictment is sufficient if it indicates that the defendants knew the objective of the conspiracy, agreed to it, and committed an overt act in furtherance thereof. *See, e. g., Blumenthal v. United States,* 332 U.S. 539, 556–57, 68 S.Ct. 248, 92 L.Ed. 154 (1947); *United States v. Crosby,* 294 F.2d 928, 945 (2d Cir. 1961), *cert. denied,* 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962). Similarly, in *Williamson v. United States,* 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278 (1907), the Supreme Court upheld an indictment which charged a conspiracy to suborn perjury despite the fact that the persons to be suborned were unnamed and the times and places not particularized. *Id.* at 446–48, 28 S.Ct. 163; *see Sanchez v. United States,* 341 F.2d 379 (1st Cir. 1975); *Llamas v. United States,* 226 F.Supp. 351 (E.D.N.Y. 1963), *aff'd,* 327 F.2d 657 (2d Cir. 1964); *cf. United States v. Gallishaw,* 428 F.2d 760, 763 (2d Cir. 1970).

■ In *United States v. Rosenblatt,* 554 F.2d 36 (2d Cir. 1977), the Second Circuit recently reviewed the conspiracy to defraud clause of section 371. There the Court stated that "[t]he law of conspiracy requires agreement as to the 'object' of the conspiracy." This, however, did not require proof that the defendants "agreed on the details of their criminal enterprise . . . [only] that the 'essential nature of the plan' must be shown." *Id.* at 38. However, it is clear from *Rosenblatt* that an indictment under the conspiracy to defraud clause of section 371 must plead the fraudulent scheme in its particulars. *Id.* at 42. In the instant case, this has been adequately done. Here, the indictment charges in detail the alleged agreement entered into by all defendants, the object of the alleged conspir-

acy and the criminal conduct contemplated. As previously noted, elaboration as to state law or the identity of the public servant to be bribed is unnecessary.[17] *Cf. Beasley, supra.*

■ In view of the cases discussed and the clear and significant federal interest in the New York Medicaid Program, and given the fact that the indictment sufficiently alleges the crime of conspiracy, Count One of the indictment properly invokes federal jurisdiction under section 371 and defendants' motion to dismiss this count must therefore be denied.[18]

17. Even assuming that it is necessary to set forth the elements of bribery under New York law, the elements have been adequately alleged. In *People v. Herskowitz*, 41 N.Y.2d 1094, 396 N.Y.S.2d 356, 364 N.E.2d 1127 (1977), the New York Court of Appeals stated that the bribery statute, Penal Law § 200.00, requires that the offeror "seek to affect the judgment or action of a public servant in his capacity 'as a public servant' ", *id.* at 1096, 396 N.Y.S.2d at 357, 364 N.E.2d at 1128, and that "by virtue of his public office [, the public servant] had colorable authority to act, as a public servant, to aid in achieving the result hoped for by the defendants," *id.* at 1095, 396 N.Y.S.2d at 356–57, 364 N.E.2d at 1128.

Paragraph three of Count One alleges that at all times during the alleged conspiracy, public servants in the Executive and Legislative branches of the government of the State of New York were considering the enactment of legislation eliminating podiatric services from coverage under the New York State Medicaid Program. Paragraph six alleges that the defendants conspired to defraud the United States by obstructing HEW in the honest distribution of federal funds and by depriving the United States of the honest participation of New York State in the federal Medical Assistance Program. It is further alleged in Paragraph seven that as part of this conspiracy the defendants agreed to defraud the United States of its right both to have federal funds distributed impartially and to have public servants in the Executive and Legislative branches of the State of New York decide impartially and honestly whether podiatric services should be eliminated from the New York State Medical Assistance Program, unhindered and uninfluenced by the offer and payment to them of bribes, gratuities or other things of value. Finally, paragraph eight alleges that the defendants agreed to raise $100,000 which was to be used to bribe a public servant of the State of New York to influence *his* opinion, judgment, action, decision, and exercise of discretion *with respect to* the elimination of podiatric services from the New York State Medical Assistance Program.

These allegations demonstrate that the defendants sought to influence official action insofar as it would affect the elimination of podiatric services from the New York State Medicaid Program. It is equally obvious that the defendants agreed to corruptly influence a public official who had decision-making authority with respect to medicaid matters then under consideration. The executive branch, including the Governor, is constitutionally charged with proposing and evaluating budgetary matters (N.Y.Const. Art. 3 § 1). Legislators obviously are bound to evaluate and vote on such proposals. *People v. Ginsberg*, 80 Misc.2d 921, 927, 364 N.Y.S.2d 260, 267 (Nassau Co. 1974), *aff'd*, 50 A.D.2d 804, 375 N.Y.S.2d 855 (2d Dept. 1975).

18. Defendants contend that the decision in *United States v. Gradwell*, 243 U.S. 476, 37 S.Ct. 407, 61 L.Ed. 857 (1916), mandates dismissal of Count One of the indictment. *Gradwell* involved prosecutions under a predecessor to § 371 against persons who allegedly had conspired to bribe voters at a Congressional election resulting in illegal voting at a primary election for the nomination of candidates to the United States Senate. *Id.* at 478, 37 S.Ct. 407. In affirming the lower court's dismissal of the indictment, 234 F. 446 (D.R.I.1916), the Court held that the then existing conspiracy statute was not intended to cover the conduct of general elections, 243 U.S. at 481, 37 S.Ct. 407, such regulation being left to the states. *Id.* at 482–86, 37 S.Ct. 407. The Court's holding rejected the government's contention that "the United States government has the right to honest, free, and fair elections, that a conspiracy to corrupt electors by bribery has for its object the denial and defeat of this right, and that it therefore is a scheme to defraud the United States . . ." *Id.* at 480, 37 S.Ct. at 408. The instant conspiracy, however, is clearly distinguishable from that in *Gradwell*. Here, election of state officials is not involved. Rather, the alleged conspiracy encompasses bribery of a public official with respect to his duty as to passage of state legislation which, as already noted, has a direct nexus to a lawful function of the United States government. *Compare Johnson, supra.* The defendants reliance on *Gradwell* is thus misplaced.

Defendants also suggest that Count One constitutes an unwarranted intervention by the federal government into matters which are properly the interest and concern of the State of New York. Without belaboring the point, Count One does not charge a violation of state law; "it charges a violation of federal criminal law. It would be a strange interpretation of federalism that left the United States unable to prosecute people for the conspiracy to defraud it." *Beasley, supra* 550 F.2d at 271.

## DEFENDANTS' MOTION TO DISMISS COUNT TWO OF THE INDICTMENT

As previously noted, Count Two of the indictment charges four defendants with a violation of section 1952 of Title 18, commonly known as the Travel Act. See note 12 *supra*. As with Count One, defendants claim that Count Two fails to invoke federal jurisdiction. Specifically, the defendants contend that the alleged interstate activity consisting of two telephone calls between New Jersey and the Eastern District of New York "played no part or [only] a minimal, marginal part in furtherance of the . . . alleged crime." They thus conclude that Count Two fails to state a cognizable offense under section 1952. Defendants further argue that Count Two must be dismissed as being impermissibly vague and also because it fails to allege the necessary elements of the crime charged. In advancing these contentions, the defendants rely on the fact that the indictment merely tracks the language of section 1952, fails to specify the public official in question, and fails to set forth the essential elements of bribery under New York law. Again, the Court rejects the defendants' assertions in all respects.

In support of their position that the interstate activity was marginal and in no way furthered the unlawful activity, defendants rely on *Rewis v. United States*, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), its two progeny, *United States v. Altobella*, 442 F.2d 310 (7th Cir. 1971) and *United States v. McCormick*, 442 F.2d 316 (7th Cir. 1971) (*per curiam*), *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973) and *United States v. Judkins*, 428 F.2d 333 (6th Cir. 1970). In *Rewis*, certain defendants operated a lottery in Florida which was frequented by out-of-state customers who were also defendants therein. Significantly, the Supreme Court noted that there was no evidence that the operator defendants had at any time crossed state lines in connection with the lottery's operation. 401 U.S. at 810, 91 S.Ct. 1056. In reversing the convictions, the Court stated that the legislative history "reveal[s] that § 1952 was aimed primarily at organized crime and, more specifically, at persons who reside in one state while operating or managing illegal activities located in another." *Id.* at 811, 91 S.Ct. at 1059. The Court also noted "§ 1952 strongly suggests that Congress did not intend that the Travel Act should apply to criminal activity solely because that activity is at times patronized by persons from another State." *Id.* at 812, 91 S.Ct. at 1059.

*Altobella* involved the extortion of a Philadelphia victim during a Chicago business trip. As in *Rewis* all the defendants' activities occurred solely in Chicago. However, the extortion did involve the cashing by the victim of a personal check drawn on a Philadelphia bank. Use of the mails was thus required for the check to clear. 442 F.2d at 311–12. The *Altobella* Court concluded "when both the use of [an] interstate facility and the subsequent act are as minimal and incidental as in this case, we do not believe a federal crime has been committed." *Id.* at 315. In *McCormick* the sole interstate effect was the placing by the defendants of an advertisement in a local newspaper which was distributed by the mails to numerous out of state residents. 442 F.2d at 317. The Court stated:

> [t]he role played by the interstate mailings was "a matter of happenstance" and "minimal and incidental" to the operations of the illegal lottery. As in *Rewis* and *Altobella* the interstate activities . . . *were the acts of others* and were not actively sought or made part of the illegal activity of the accused. . . [D]efendant[s] neither *"used" nor "caused to be used" any interstate facility as an instrumental part of his illegal operations.*

*Id.* at 318 (emphasis supplied).

Based on the above review of *Rewis, Altobella* and *McCormick*, major differences among them and the instant case become readily apparent. As the Second Circuit stated in *United States v. Kahn*, 472 F.2d 272 (2d Cir.), *cert. denied*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973),

> [t]he common thread through each of these decisions is that the *defendants*

*themselves engaged in no interstate activities,* and that the total interstate travel aspect of the enterprises was either marginal or unforeseen. Indeed, the *Rewis* court left open the question of whether proof of active solicitation of an interstate clientele might come within the Act, and cited with explicit approval cases where the statute was applied to individuals whose agents or employees crossed state lines in furtherance of an illegal activity.

*Id.* at 285 (emphasis supplied). In the instant case, the defendants themselves used interstate facilities in furtherance of the illegal scheme. It was neither marginal nor incidental but constituted a central part of and greatly facilitated the defendants' overall plan. The fact that considerable intrastate activity also occurred does not alter the applicability of the Travel Act. *See United States v. LeFaivre,* 507 F.2d 1288 (4th Cir. 1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975); *United States v. McLeod,* 493 F.2d 1186 (7th Cir. 1974); *United States v. DeSapio,* 435 F.2d 272 (2d Cir. 1970), *cert. denied,* 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971).[19]

█ Defendants' other arguments with respect to Court Two must also be rejected. The mere tracking of the language of section 1952 does not render the indictment legally insufficient. *E. g., United States v. Levine,* 457 F.2d 1186, 1189 (10th Cir. 1972). *United States v. Nichols,* 421 F.2d 570, 573–74 (8th Cir. 1969); *Turf Center, Inc. v. United States,* 325 F.2d 793, 796 (9th Cir.

1963); *see, e. g., United States v. Trotta,* 525 F.2d 1096, 1099 (2d Cir. 1975), *cert. denied,* 425 U.S. 1971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); *United States v. Cohen,* 518 F.2d 727, 732–33 (2d Cir.), *cert. denied,* 423 U.S. 926, 96 S.Ct. 270, 46 L.Ed.2d 252 (1975); *United States v. Salazar,* 485 F.2d 1272, 1277 (2d Cir. 1973), *cert. denied,* 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974); *United States v. Fortunato,* 402 F.2d 79, 82 (2d Cir. 1968), *cert. denied,* 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969).

█ Similarly, failure to set forth the elements of bribery under New York laws also does not render the indictment insufficient. Such a contention was categorically rejected by the Seventh Circuit in *United States v. Rizzo,* 418 F.2d 71 (7th Cir. 1969), *cert. denied,* 397 U.S. 967, 90 S.Ct. 1006, 25 L.Ed.2d 260 (1970). There the Court stated:

> [t]he gravamen of a charge under Sections 371 and 1952 is the violation of federal law. As it relates to the substantive counts, the offense is the use of an interstate facility, with the intent to promote or further an unlawful activity in violation of state law, and the performance of some act designed to promote or further that illegal purpose. *Reference to state law is necessary only to identify the type of unlawful activity in which the defendants intended to engage.*
>
> It is not necessary to allege the elements of the state substantive offense intended to be committed, or that the unlawful objective intended was accomplished.

---

**19.** Defendants' reliance on *United States v. Archer,* 486 F.2d 670 (2d Cir. 1973) and *United States v. Judkins,* 428 F.2d 333 (6th Cir. 1970) are likewise misplaced. In *Archer,* various telephone calls were involved. The Klein call was disregarded as being totally manufactured by the government. 486 F.2d at 681. The Wasserberger calls were also held insufficient as they "also resulted from a plant by the Government . . . which provoked interstate calls that Wasserberger would not otherwise have made." *Id.* at 682. The Paris call from the federal undercover agent, Basio, to Klein likewise was held insufficient. At the time of the call, Basio was in France on an unrelated narcotics investigation. *Id.* at 673. The Court

stated that this call served no useful purpose and that the call was in no way initiated by defendant. *Id.* at 683. In *Judkins,* a case involving prostitution, four interstate telephone calls were involved. These calls, however, were characterized "as a greeting or salutation", expressions of "personal feelings", and "personal" in substance. In brief, the Court found that the calls were in no way connected with the business or operation of the house of prostitution and thus, it could not be said "beyond a reasonable doubt [that] the use of interstate facilities [was made] with intent to promote, manage, facilitate, or carry on the prostitution business". 428 F.2d at 335.

*Id.* at 74 (emphasis supplied); *see United States v. Pomponio,* 511 F.2d 953, 957 (4th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975); *United States v. Corallo,* 413 F.2d 1306, 1320 (2d Cir. 1969); *McIntosh v. United States,* 385 F.2d 274, 276 (8th Cir. 1967).[20] From this also flows the conclusion that it is likewise unnecessary to name in the indictment the public official who was the alleged object of the bribe.[21]

## THE MARION MOTIONS

The instant indictment arose out of a joint investigation conducted by the King's County District Attorney's Office, the New York City Police Department and the United States Attorney's Office for the Eastern District of New York. At various times during the investigation, a series of wiretap and eavesdropping orders were authorized by four State Supreme Court judges on application of the King's County District Attorney. These orders permitted the interception of conversations relating to bribery of public officials and conspiracy to commit this act in violation of the New York Penal Law, sections 200.00, 200.10, 105.05.[22] No federal offense was alleged in these orders.

Subsequent to the expiration of these wiretap orders, the United States Attorney for the Eastern District of New York sought and obtained an amendment of the state orders pursuant to 18 U.S.C. § 2517(5). Each amendment order was signed by the state judge who had initially authorized the state intercept order. The amendments permitted the interception of communications relating to five federal offenses: interference with interstate commerce by threats or violence, 18 U.S.C. § 1951 (1970); interstate travel or transportation in aid of racketeering enterprises, 18 U.S.C. § 1952 (1970); fraud by wire, 18 U.S.C. § 1343 (1970); aiding and abetting in the commission of the aforementioned offenses, 18 U.S.C. § 2 (1970); and conspiracy to commit the above offenses, 18 U.S.C. § 371 (1970). The intercepted communications were later presented to the federal grand jury that returned the instant indictment.

The defendants have moved to dismiss the indictment, or alternatively to suppress the interceptions, on the ground that the wiretap evidence was submitted to the grand jury in violation of 18 U.S.C. § 2517(5) (1970).[23] In support of this contention, the defendants primarily rely on the recent Second Circuit decision in *United States v. Marion,* 535 F.2d 697 (2d Cir.

**20.** Assuming *arguendo* that the elements of bribery under New York law are required, the Court has already noted that these requirements have been satisfied since all paragraphs alleged in Count One, except for paragraph six, are incorporated in the § 1952 count. *See* n. 17 *supra; United States v. Kahn,* 472 F.2d 272, 277 (2d Cir. 1973), *cert. denied,* 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973).

**21.** Defendant DeCicco claims that as to both counts, venue is improper in the Eastern District of New York. Both counts of the indictment reveal, however, that some activity occurred within the Eastern District of New York. Venue in this district, therefore, has been properly alleged. *See Hyde v. United States,* 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); *United States v. Polizzi,* 500 F.2d 856, 899 (9th Cir. 1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975); *United States v. Guinn,* 454 F.2d 29, 33 (5th Cir.), *cert. denied,* 407 U.S. 911, 92 S.Ct. 2437, 32 L.Ed.2d 685 (1972). *Cf. United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 38 L.Ed.2d 561 (1973).

**22.** These orders were issued pursuant to 18 U.S.C. § 2516(2) (1970).

**23.** 18 U.S.C. § 2517(5) provides:

When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

1976), which substantially altered the previous judicial interpretation and application of § 2517(5). *See id.* at 708 (Anderson, J., dissenting). Based on *Marion*, the defendants contend that the indictment must be dismissed because (1) a separate federal wiretap order was not obtained; (2) the amendment to the state orders was not obtained "as soon as practicable"; (3) any use of the interceptions to prove violations of the conspiracy to defraud clause of section 371 is improper since section 2516 of Title 18 does not specifically authorize interception of communications relating to that offense; and (4) the interceptions were improperly submitted to the grand jury in that the amendment orders failed to specify the conspiracy to defraud clause of section 371.

■ Before turning to each of these arguments, the background and purpose of the federal wiretap legislation is to be noted. Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* (1970), embodies comprehensive federal legislation in the area of wiretapping and electronic surveillance. The Act was enacted to conform with the constitutional requirements for electronic surveillance set forth by the Supreme Court in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In accordance with the *Berger-Katz* admonition, Title III authorizes the interception of oral and wire communications only in the investigation of specified serious crimes, 18 U.S.C. § 2516(1) & (2) (1970), and only after prior judicial approval has been obtained. Such approval is obtainable only after compliance with Title III's strict procedures, 18 U.S.C. § 2518 (1970), *see United States v. Giordano*, 416 U.S. 505, 513, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974); *Gelbard v. United States*, 408 U.S. 41, 46, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972); *Marion, supra* at 700. Thus, the Act establishes "the minimum standard against which the interception in question must be judged." *Marion, supra* at 701; *see* S.Rep. No. 1097, 90th Cong., 2d Sess., at 12, *quoted in* 2 U.S.Code Cong. & Admin.News, pp. 2112, 2187 (1968). Unless authorized by Title III, all interceptions of wire and oral communications are prohibited. *See Gelbard, supra*, 408 U.S. at 46, 92 S.Ct. 2357.

Sections 2515 and 2517 of Title III, 18 U.S.C. §§ 2515, 2517 (1970), form an integral part of the Title III scheme. *See Gelbard, supra* 408 U.S. at 50, 92 S.Ct. 2357; *Marion, supra* at 706; *United States v. Brodson*, 528 F.2d 214, 215–16 (7th Cir. 1975). Section 2515 provides that the contents of electronic surveillance, and any derivative evidence thereby obtained, may not be used at a criminal trial or before any grand jury "if the disclosure of that information would be in violation of this chapter." This section thus establishes an evidentiary prohibition designed to enforce the limitations imposed by Title III on electronic surveillance. *Gelbard, supra* 408 U.S. at 48–50, 92 S.Ct. 2357; S.Rep. No. 1097, *supra* at 96, *quoted in* 2 U.S.Code Cong. & Admin. News, *supra* at 2184. If the requirements of Title III are followed, however, section 2517 authorizes the use and disclosure of intercepted communications, 18 U.S.C. § 2517(1)–(3) (1970), unless the intercepted communication "relat[es] to offenses other than those specified in the order of authorization or approval . . . .", 18 U.S.C. § 2517(5) (1970). In the latter instance, a second application must be made "as soon as practicable", *id.*, to a judge of competent jurisdiction. This judge must determine the good faith of the original wiretap application before authorizing disclosure and use of the "other" offenses. *Marion, supra* at 700; *Brodson, supra* at 216.

With this general overview in mind, the defendants' contentions can now be properly examined. Since the defendants' "as soon as practicable" argument and their separate federal order contention apply to both the section 371 and the section 1952 counts, these will be addressed initially.

■ With respect to the allegation that the amendment to the state order was not obtained "as soon as practicable", it is important to note that the Second Circuit has

stated that this requirement is to be viewed "in a common-sense fashion." *Marion, supra* at 707. Here, the amendment was obtained approximately three months after expiration of the initial wiretap orders. While such a delay may be improper under certain circumstances, this Court finds no error under the instant facts. Decisions which have analyzed the above requirement have all involved use of the "communications relating to offenses other than those specified in the [initial] order of authorization or approval" prior to obtaining judicial approval for the disclosure. *See Marion, supra* at 707–08; *Brodson, supra* at 215. This is not the case here since the state court authorization permitting disclosure of the intercepted communications as evidence of possible federal offenses was obtained prior to disclosure of the seized conversations. Under these circumstances, the defendants can show no prejudice since prior to the use of the interceptions, a judge of competent jurisdiction had favorably passed on the good faith and the legality of the initial orders. Therefore, the Congressional intent behind section 2517(5) was served and the procedure followed herein conformed with the underlying purpose and requirements of Title III. To hold otherwise would be to exalt form over substance.[24] *See United States v. Vento*, 533 F.2d 838, 855 (3d Cir. 1973).

Defendants next contend that the Second Circuit's decision in *Marion* requires a separate federal disclosure order under the facts of this case. Such an approach, however, represents an excessively restrictive interpretation of *Marion*. There, in the context of a joint federal and state investigation, the Court stated that a separate federal order

> is the necessary result of a statutory schema [sic] which restricts federal and state wiretaps, in the first instance, to enumerated federal and state offenses respectively. Inasmuch as the interception

of communications relating to different federal offenses would not, under those circumstances, be incidental, it would be neither unduly onerous nor inappropriate under Title III to secure separate prior judicial authorizations.

*Marion, supra* 535 F.2d at 707 n. 20 (citations omitted). The Court, however, went on to add that subsequent judicial approval with respect to the "unrelated" federal offenses was *not* limited solely to federal judges and that Title III itself did not draw such a fine distinction. *Id.* at 708.

■ The instant investigation entailed a series of ten wiretap orders and extensions which were presented to four judges of the New York Supreme Court. Each amendment order sought by the United States Attorney was submitted to the state judge who had signed the original state order. Each judge was fully aware of the circumstances of this extensive and prolonged investigation and was thus fully capable of rendering an informed and impartial decision as to the legality of the initial orders and the propriety of the amendment orders. Submission of the amendment orders to a federal judge would have resulted in an unnecessary and time consuming delay during which the federal judge would have had to review and analyze a vast amount of orders, applications and wiretap evidence. When, as here, "the state judge who initially authorized the wiretap [is] in a far better position to gauge the bona fides of the original application and the incidental nature of the interception of conversations concerning possible federal offenses", submission of the amendment order to a federal judge is not required. *Id.*

■ The defendants' next contention that either dismissal or suppression is warranted since section 2516 does not authorize interception of communications relating to the conspiracy to defraud clause of section

---

**24.** The Court notes that prior to *Marion* it had been assumed that subsequent judicial approval was not required under facts similar to the ones herein. *See Marion, supra* (Anderson, J., dissenting). The government obtained the amendments herein only 26 days after the decision in *Marion*.

371 is likewise without merit.[25] While Title III requires that the initial wiretap order relate to those crimes specified in section 2516, such is not the case with respect to other offenses inadvertently discovered during the course of a lawful wiretap. *See United States v. Pacheco,* 489 F.2d 554, 564 (5th Cir. 1974), *cert. denied,* 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975); *United States v. Lanza,* 341 F.Supp. 405, 413 (M.D. Fla.1972). *Cf. United States v. Masciarelli,* 558 F.2d 1064, 1067 (2d Cir. 1977). *But see People v. Schipani,* 56 A.D.2d 126, 129–131, 391 N.Y.S.2d 875, 879 (App.Div.1977).

> Paragraph (5) [of section 2517] provides that if an investigative or law enforcement officer, *while engaged in intercepting wire or oral communications in a manner authorized in the chapter,* intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed as provided in subsections (1) and (2) of this section . . . .. Such contents and any evidence derived therefrom may be introduced in evidence under subsection (3) of this section only when authorized or approved by a judge of competent jurisdiction . . . where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. *They need not be designated "offenses".*

S.Rep. No. 1097, *supra* at 12, *quoted in* 2 U.S.Code Cong. & Admin.News 1968, *supra* at 2189. (emphasis supplied). Accordingly, in *United States v. Tortorello,* 480 F.2d 764 (2d Cir. 1973), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1974), the Second Circuit affirmed the conviction of the defendant for violations of the Securities Act of 1933, 15 U.S.C. § 77a (1970) *et seq.,* mail fraud, 18 U.S.C. § 1341 (1970) and conspiracy, 18 U.S.C. § 371 (1970), despite the fact that neither the Securities Act nor mail fraud violations are listed in section 2516.[26] Therefore, acceptance of the defendants' contention would place an unwarranted restriction on the legitimate use of wiretap evidence which is neither necessary to further the aims and objectives of Title III nor warranted by the Act's legislative history.

Defendants' final contention presents the most serious challenge to the instant indictment. The defendants argue that the government failed to comply with the strict requirements of section 2517(5) since the government's amendment orders did not specify the conspiracy to defraud clause of section 371. Since no independent authorization permitting disclosure of the wiretap evidence with respect to the 371 offense was obtained, the defendants contend that the wiretap evidence was improperly submitted to the grand jury, thereby requiring dismissal of the indictment. Alternatively, the defendants request suppression of all the wiretap evidence.

Prior to discussing the merit of this claim, it must be noted that the defendants' contention can only apply to Count One of the indictment. Count Two of the indictment charges four defendants with a violation of the Travel Act, 18 U.S.C. § 1952. The government's amendment orders did specify a section 1952 violation and, thus, a proper section 2517(5) disclosure order was obtained as to Count Two.

In response to the defendants' argument, and relying on *Marion,* the government contends that a section 2517(5) disclosure order was not required here. It contends that the disputed federal offense is "sufficiently similar" to the state crimes for which the wiretap order was obtained thus "obviat[ing] the need for any § 2517 approval". *See Marion, supra,* 535 F.2d at 704 n. 13.

---

**25.** For this purpose the Court notes that § 1952, Count Two of the indictment, is an offense listed in § 2516.

**26.** Evidence concerning the fraudulent securities transaction was intercepted during the course of surveillance authorized pursuant to a valid state court wiretap order. *United States v. Tortorello,* 480 F.2d 764, 771 (2d Cir. 1973), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1974).

More specifically, the government urges that the crime of conspiracy to defraud the United States in violation of section 371 and the state offense of conspiracy to commit the crime of bribery are "sufficiently similar." [27] The defendants claim that this interpretation of *Marion* is at odds with the true holding of the case and "nothing more than an *en passant* comment upon which the court's holding did not rest." [28] The defendants further urge that even if such an interpretation of *Marion* is permissible, the state and federal offenses are not "sufficiently similar to obviate any need for § 2517 approval." *Marion, supra* at 704 n. 13.[29]

■ The Court, however, need not decide the issue presented by the parties. Even assuming that a violation of section 2517(5) occurred, neither dismissal of the indictment nor suppression of the wiretap evidence is warranted under the circumstances of this case. For the reasons to be fully developed below, it is found that the purposes of Title III have not been frustrat-

**27.** In support of this contention the government relies on *Shushan v. United States,* 117 F.2d 110 (5th Cir. 1940), *cert. denied,* 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531 (1941). There, in an analogous context the Court stated that

[a] scheme to get a public contract on more favorable terms than would likely be got otherwise by bribing a public official would not only be a plan to commit the crime of bribery, but would also be a scheme to defraud the public. . . . No trustee has more sacred duties than a public official and any scheme to obtain an advantage by corrupting such a one must in the federal law be considered a scheme to defraud.

*Id.* at 115. The government goes on to note that under federal law the public official who is to receive the bribe need not be a federal employee; all that need be shown is that a federal program is involved. *See United States v. Del Toro,* 513 F.2d 656, 663–64 (2d Cir.), *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975).

**28.** Defendant's Reply Memorandum in Support of Defendant Frank's Motion (1) To Dismiss The Indictment on Grounds That the Government Violated 18 U.S.C. §§ 2517(5), 2515; (2) To Suppress at 19. (emphasis in original).

**29.** In support of this contention, the defendants rely on *Marion* and the Seventh Circuit's decision in *Brodson, supra,* which was cited with approval throughout the decision in *Marion.* In *Brodson,* a wiretap order was obtained for violations of 18 U.S.C. § 1955 (1970) (operation of an illegal gambling business in interstate commerce). Without obtaining a § 2517(5) disclosure order, the government used the wiretap evidence in a prosecution for violations of 18 U.S.C. § 1084 (1970) (transmission of wagers and wagering information in interstate commerce). In affirming the dismissal of the indictment, the Court rejected the government's contention that a disclosure order was unnecessary since the evidence obtained under the § 1955 order applied equally as well to the § 1084 prosecution.

This is of no consequence here because the two offenses are wholly separate and distinct; they involve dissimilar elements and require different evidence, even though some of it might overlap because both concern illegal gambling.

*Brodson,* 528 F.2d at 216; *see Marion, supra* 535 F.2d at 704. Based on this reasoning, the defendants herein argue that the elements necessary for a violation of § 371 are substantially different from those necessary to prove a violation of the state offense charged in the wiretap order.

The defendants further contend that cases relied on by the *Marion* Court in footnote 13, which addresses the substantially similar test, indicate that the federal and state offenses herein can not be substantially similar given the "definite federal jurisdictional flavor", *United States v. Bell,* 524 F.2d 202, 209 (2d Cir. 1975); *see United States v. Bass,* 404 U.S. 336, 350, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), required for a violation of § 371. *See Marion, supra* at 704 n. 13. In other words, the defendants urge that the mere requirement of an interstate nexus needed for proof of a § 371 violation but not for a violation of the state crimes named in the wiretap order is sufficient to require procurance of an § 2517(5) disclosure order.

While no court has specifically adopted the defendants' interpretation of *Marion* and *Brodson,* the Fifth Circuit in *United States v. Campagnuolo,* 556 F.2d 1209 (5th Cir. 1977), has apparently given such an approach at least tacit approval. In *Campagnuolo,* the Court stated that the *Marion* and *Brodson* Courts

have interpreted . . . the words "other offenses" [in § 2517(5) to] refer to particular statutory violations different from those designated in the authorization order, rather than offenses constituting a different generic type of criminal activity.

*Id.* at 1213.

ed by any violation of section 2517(5) that might have occurred to warrant either of these drastic remedies.

■■ Contrary to defendants' implied assertion, the Court has been unable to discover any case which specifically addresses the issue of whether dismissal is the exclusive remedy for an alleged violation of section 2517(5). *See United States v. Campagnuolo*, 556 F.2d 1209, 1212 n. 3 (5th Cir. 1977). While the *Brodson* Court stated that "[d]ismissal of an indictment is the ultimate sanction for the Government's failure to act properly", 528 F.2d at 216, the Court did not state that dismissal of the indictment was the only appropriate remedy. Moreover the cases cited by the *Brodson* Court in support of the dismissal therein clearly show that such action is addressed to the sound discretion of the court. *See United States v. Thompson*, 493 F.2d 305, 308–09 (9th Cir.), *cert. denied*, 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974); *United States v. Johnson*, 463 F.2d 70, 73 (10th Cir. 1972); *Truchinski v. United States*, 393 F.2d 627, 632 (8th Cir.), *cert. denied*, 393 U.S. 831, 89 S.Ct. 104, 21 L.Ed.2d 103 (1968); *Jones v. United States*, 119 U.S.App.D.C. 284, 342 F.2d 863, 873 (1964); *United States v. Tane*, 329 F.2d 848, 853 (2d Cir. 1964). As the Second Circuit stated in *Tane*,

> [a] defendant has no right to have an indictment dismissed merely because incompetent or inadequate evidence was presented to the Grand Jury. But a motion to dismiss or quash an indictment because of the absence or incompetency of evidence before the Grand Jury is addressed to the discretion of the trial court, and the decision to grant or deny the motion will not be reversed unless there has been an abuse of that discretion. As long as there is some competent evidence to sustain the charge issued by the Grand Jury, an indictment should not be dismissed.

*Id.* at 853–54 (citations omitted).

The Supreme Court also has rejected the concept that there is an automatic right to dismissal of an indictment. Relying, *inter alia*, on *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) and *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), the Supreme Court has stated

> [e]ven if we assume that the Government did acquire incriminating evidence in violation of the Fifth Amendment, Blue would at most be entitled to suppress the evidence and its fruits if they were sought to be used against him at trial. While the general common-law practice is to admit evidence despite its illegal origins, this Court in a number of areas has recognized or developed exclusionary rules where evidence has been gained in violation of the accused's rights under the Constitution, federal statutes, or federal rules of procedure. *Our numerous precedents ordering the exclusion of such illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution altogether. So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book.*

*United States v. Blue*, 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510 (1966) (emphasis supplied, citations and footnotes omitted). Furthermore, it has been held that an indictment need not be quashed because it was substantially based on hearsay testimony, *Costello v. United States*, 350 U.S. 359, 361, 363–64, 76 S.Ct. 406, 100 L.Ed. 397 (1956), incompetent or inadequate evidence, *Holt v. United States*, 218 U.S. 245, 248, 31 S.Ct. 2, 54 L.Ed. 1021 (1910), or even on the basis of information obtained in violation of a defendant's Fifth Amendment privilege, *Lawn v. United States*, 355 U.S. 339, 349–50, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). *See e. g., Gelbard, supra,* 408 U.S. at 60, 92 S.Ct. 2357; *Loraine v. United States*, 396 F.2d 335, 339 (9th Cir.), *cert. denied*, 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 (1968). Of similar import is the

Supreme Court's decision in *United States v. Calandra*, 414 U.S. 338, 345–52, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) which held that evidence seized in violation of Fourth Amendment rights was properly before the grand jury. Moreover, in the specific context of electronic surveillance, the Supreme court has held that the exclusionary rule excludes from trial evidence electronically seized in violation of the Fourth Amendment. *Alderman v. United States*, 394 U.S. 165, 171, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). Since like *Blue, Alderman* relied on *Mapp* and *Weeks*, it is "implicit [in *Alderman*] that the remedy [for an illegal wiretap interception] does not extend to barring the prosecution altogether." *Blue, supra* 384 U.S. at 255, 86 S.Ct. at 1419.

The legislative history of Title III also lends support to the conclusion that dismissal of the indictment is not the exclusive or mandatory remedy for a violation of section 2517(5). *Cf. Gelbard, supra* (Rehnquist, J., dissenting). As previously noted sections 2515 and 2517 must be read in conjunction and together form an integral part of Title III. With respect to section 2515, the legislative history is informative.

Section 2515 of the new chapter imposes an evidentiary sanction to compel compliance with the other provisions of the chapter. . . . *The provision must, of course, be read in light of section 2518(10)(a)* . . . which defines the class entitled to make a motion to suppress. It largely reflects existing law.

It applies to suppress evidence directly . . . or indirectly obtained in violation of this chapter.

S.Rep. No. 1097, *supra* at 96, *quoted in* 2 U.S.Code Cong. & Admin.News, *supra* at 2184–85 (emphasis supplied) (citations omitted). With respect to section 2517, the Senate Report provides a similar conclusion.

Section 2517 of the new chapter authorizes the use and disclosure of intercepted wire or oral communications in specified circumstances. *Section 2517 must, of course, be read in light of section 2518[(10)(a)].*

S.Rep. No. 1097, *supra* at 103, *quoted in* 2 U.S.Code Cong. & Admin.News, *supra* at 2188. (emphasis supplied). With respect to section 2518(10)(a) [30] the Senate Report states that

[p]aragraph (10)(a) provides that any aggrieved persons, as defined in section 2510(11) . . . in any trial, hearing or other proceeding in or before any court department, officer, agency, regulating body or other authority of the United States, a State, or a political subdivision of a State may make a motion to suppress the contents of any intercepted wire or oral communication or evidence derived therefrom. *This provision must be read in connection with sections 2515 and 2517 . . . which it limits. It provides the remedy for the right created by section 2515.* Because no person is a party as such to a grand jury proceeding, the pro-

---

**30.** 18 U.S.C. § 2518(10)(a) provides:

Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom on the grounds that—

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval.

Such motion shall be made before the trial, hearing, or proceeding unless there was no opportunity to make such motion or the person was not aware of the grounds of the motion. If the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall be treated as having been obtained in violation of this chapter. The judge, upon the filing of such motion by the aggrieved person, may in his discretion make available to the aggrieved person or his counsel for inspection such portions of the intercepted communication or evidence derived therefrom as the judge determines to be in the interests of justice.

vision does not envision the making of a motion to suppress in the context of such a proceeding itself. *Normally, there is no limitation on the character of evidence that may be presented to a grand jury which is enforcible by an individual.* (Blue v. United States, *86 S.Ct. 1416, 384 U.S. 521 (1965).) There is no intent to change this general rule.*

S.Rep. No. 1097, *supra* at 106, *quoted in* 2 U.S.Code Cong. & Admin.News, *supra* at 2195 (emphasis supplied).

 Both the case law and the legislative history of Title III indicate that dismissal of an indictment is neither the exclusive nor the mandatory remedy for a violation of section 2517(5). This conclusion, however, should not be interpreted to mean that dismissal is never the appropriate remedy for violation of section 2517(5) or that the suppression procedure under 18 U.S.C. § 2518(10)(a) (1970) is the only avenue available to a defendant for a violation of section 2517(5). *Cf. Gelbard, supra* (section 2515 a defense to contempt proceedings under 28 U.S.C. § 1826(a) (1970)). Instead, as previously noted, dismissal rests in the sound discretion of the Court. Moreover, as the Supreme Court has noted

"[not] every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful.'" To the contrary, suppression is required only for a "failure to satisfy any of those statutory requirements that directly and substantially implement the Congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device."

*United States v. Donovan,* 429 U.S. 413, 433–34, 97 S.Ct. 658, 671, 50 L.Ed.2d 652 (1977), *quoting United States v. Chavez,* 416 U.S. 562, 574–75, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1975) and *Giordano, supra* 416 U.S. at 527, 94 S.Ct. 1820.

Thus the proper procedure in deciding what, if any, sanction is appropriate requires an examination of the purpose to be served by the Title III requirement which

has been violated and a decision as to whether that purpose has been frustrated by the violation. *Cf. Donovan, supra* 429 U.S. at 433–40, 97 S.Ct. 658; *Stone v. Powell,* 428 U.S. 465, 482–89, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Calandra,* 414 U.S. 338, 348–52, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Marion, supra* at 703–04; *United States v. Vento,* 533 F.2d 838, 855 (3d Cir. 1976); *Brodson, supra* at 216–17. While undertaking this examination, the Court is aware of the Second Circuit's admonition that strict compliance with section 2517(5) is essential and that any deviation must be strictly construed so as not to render the strictures of Title III nugatory. *Marion, supra* at 706.

Title III was designed in part to prevent the government from

obtain[ing] an overly broad wiretap authorization for one offense as a pretext for gaining information with respect to offenses for which probable cause could not be established or for which wiretap authorization would be unavailable.

*United States v. Masciarelli,* 558 F.2d 1064, 1067 (2d Cir. 1977). In order to prevent such an abuse, Congress enacted the section 2517(5) requirement of subsequent judicial approval before disclosure of intercepted communications relating to "offenses other than those specified in the order of authorization or approval". Absent such a requirement

the applicant could easily name one crime while in fact he may have anticipated intercepting evidence of a different crime for which the prerequisites could not be satisfied. Such "subterfuge searches", in addition to their dissonance with Title III, would indeed run afoul of the Fourth Amendment. Without a judge's determination of inadvertence, Title III authorization might rapidly degenerate into what Justice Clark recently termed "the electronic equivalent . . . of a 'general search warrant.'"

*Marion, supra* at 701 (citations omitted); *see Brodson, supra* at 215. The legislative history of section 2517(5) clearly enumerates the procedure that the reviewing judge

must undertake on the subsequent application and clearly voices the Congressional concerns which lead to the enactment of section 2517(5).

> Such subsequent application would include a showing that the original order was lawfully obtained, that it was sought in good faith, and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order.

S.Rep. No. 1097, *supra* at 12, *quoted in* 2 U.S.Code Cong. & Admin.News, *supra* at 2189 (citations omitted).

The courts which have addressed the section 2517(5) issue clearly have recognized this concern. In *Brodson, supra*, the Seventh Circuit dismissed an indictment for failure to comply with the section 2517(5) requirement. There, however, no 2517(5) application of *any* kind was made prior to the disclosure of the intercepted communications to the grand jury. 528 F.2d at 215. No impartial and independent judicial inquiry was made as required by section 2517(5) prior to the use of the electronic surveillance. Thus, the purpose of the section as evidenced in the above legislative history was clearly frustrated. Similarly, in *Marion* intercepted communications relating to offenses other than those specified in the wiretap order were disclosed prior to the procurement of a 2517(5) order. 535 F.2d at 703–04. Again no proper showing was made as required by the legislative history and the clear purpose of section 2517(5) was subverted.

The instant facts, however, are clearly dissimilar to those in *Marion* and *Brodson*. First, there is no question that the conversations were the proper subject of interception since they are clearly probative of the state crimes named in the initial state wiretap orders. It follows, therefore, that the interceptions can properly be used in any state criminal proceedings. Since the interceptions herein also were probative of distinct federal offenses, unlike the situations in *Marion* and *Brodson*, the government did obtain a 2517(5) disclosure order prior to any use of the intercepted communications in federal proceedings. Though the amendment applications did not name section 371, the government was compelled to make the showing required by section 2517(5) prior to the state judges' authorization of the amendment order. Thus, in permitting disclosure of all the interceptions presently under attack, the state judge had to find that the original order was lawfully obtained, sought in good faith and not as a subterfuge. *Cf. United States v. Tortorello*, 480 F.2d 764, 783 (2d Cir. 1973), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1974). Therefore, the purpose of section 2517(5) was served.

Moreover, this Court can find no fault with the state judge's conclusion as to the propriety of an amendment. The electronic surveillance disclosed a wealth of relevant and material conversations relating to the state crimes named in the original wiretap authorization. This certainly justified the conclusion that the original orders were lawfully obtained in good faith and were not a mere subterfuge search. Nothing about the facts of this case suggests that the investigation was used as a mere pretext. *Cf. Masciarelli, supra* 558 F.2d at 1068. Additionally, the good faith of the initial orders is evidenced by the state indictment handed up against the defendants herein charging violations of the crimes named in the original state wiretap orders. *See id.* Furthermore, the defendants can not claim nor have they claimed that failure to name the conspiracy to defraud clause of section 371 in the amendment order was intentional or designed to frustrate the purposes behind Title III. *Cf. Donovan, supra* 429 U.S. at 444, 97 S.Ct. 658 (Burger, C. J., concurring).

The purpose of obtaining a 2517(5) disclosure order is to insure that the original wiretap was obtained in good faith and not as a subterfuge. This was accomplished when the federal government obtained the disclosure order permitting use of the wiretap evidence for, inter alia, the section 1952 offense upon which an indictment was obtained as to four defendants. Returning to a judge to get a further disclosure order

for the section 371 offense would have served no useful purpose and would have in no way furthered any goal of Title III. This is especially true where, as here, each intercepted conversation was properly intercepted pursuant to the initial state order and is probative of both the offenses named in the initial and amended state orders and section 371.[31] Here the preconditions to judicial authorization were satisfied when the state judge specifically authorized disclosure as to the section 1952 offense. The fact that the state judge was simply unaware that additional federal crimes might be involved does not detract from his conclusion that the statutory amendment requirements for each interception involved herein had been met. *See Donovan, supra* 429 U.S. at 672, 97 S.Ct. at 435. "In no meaningful sense can it be said that the presence of that information as to [a section 371 violation] would have precluded authorization of the [section 2517(5) disclosure order]." *Id.* Since the preconditions to a 2517(5) authorization were met with respect to the interceptions at issue, the defendants can claim no prejudice. The "careful judicial scrutiny," *United States v. Gigante,* 538 F.2d 502, 505 (2d Cir. 1977); *Marion, supra* at 698, which Title III mandates throughout the entire process of intercepting and utilization of wiretap evidence for all intents and purposes has been followed. While it would have been better practice to obtain a second disclosure order, *see Campagnuolo, supra,* the Court does not believe that dismissal of the indictment or suppression of the evidence is warranted or necessitated under the circumstances of this case. *Cf.*

*United States v. Rabstein,* 554 F.2d 190, 193–94 & n. 6 (5th Cir. 1977); *Vento, supra* at 855, *United States v. Iannelli,* 477 F.2d 999, 1001 (3d Cir. 1973); *aff'd,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). As the Supreme Court stated in *Blue, supra,* "[s]o drastic a step might advance marginally some of the ends served by [Title III], but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book." 384 U.S. at 255, 86 S.Ct. at 1419. Under these facts, this Court does not deem it necessary to take such a drastic step.

### HALI WIRETAP

■ Defendant Hali raises a variety of contentions which he claims require the suppression of his conversations obtained under the electronic surveillance authorized by the New York State wiretap and eavesdropping orders. Hali first challenges the legality of the initial Plants I and J orders as having failed to comply with the statutory requirements of section 700.30(2)[32] of the New York Criminal Procedure Law and section 2518(4)(a)[33] of Title 18. Since he was a "known" member of the conspiracy at the time the orders were authorized, Hali argues that suppression is proper as the orders failed to identify him as a person to be intercepted.[34] This the Court cannot accept.

The weakness of Hali's argument is underscored by the Supreme Court's opinion in *United States v. Donovan,* 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977),[35] where the Court stated:

> 2. The identity of the person, if known, whose communications are to be intercepted

**31.** A different conclusion would arguably be appropriate where after obtaining a § 2517(5) disclosure order for interceptions which are probative of both the offenses named in an initial wiretap order and in the § 2517(5) disclosure order, the government discloses interceptions which are in no way related to or probative of any of those offenses, but in fact relate to completely separate and distinct criminal activity. A § 2517(5) disclosure order would then seem to be appropriate as to these interceptions.

**32.** § 700.30 provides in pertinent part
 An eavesdropping warrant must contain:

**33.** 18 U.S.C. § 2518(4)(a) contains identical language.

**34.** Plant I permitted the interception of conversations of "John Valente, Louis DiFazio, Joseph DeCicco, Sy Frank, David Schulenfand, and others as yet unknown." Plant J named "Louis DiFazio, Joseph DeCicco, John Valente, and others as yet unknown."

**35.** While *Donovan* focused on the sufficiency of the government's application under 18 U.S.C. § 2518(1)(b)(iv) (1970), its reasoning equally

This Court already has ruled that the Government is not required to identify an individual . . . unless it ha[d] probable cause to believe (i) that the individual is engaged in the criminal activity under investigation *and (ii) that the individual's conversation will be intercepted over the target telephone.*

*Id.* 429 U.S. at 423, 97 S.Ct. at 665 (emphasis supplied). While Hali meets the first of the dual *Donovan* tests, he has failed to convince this Court that there was probable cause to believe that he would be intercepted over the target telephones involved in the Plant I & J taps.[36] A review of the wiretap evidence and the affidavits submitted in support of the Plant I and J orders indicates that only as to the persons actually named in each order was there sufficient grounds to believe that they would place calls from or to the telephones listed in the Plant I and J orders. In contrast to this, there does not appear to have been sufficient probable cause to indicate that defendant Hali was "a suspect placing calls to the target telephone [or] a suspect placing calls from that telephone." *Id.* at 425, 97 S.Ct. at 666. Defendant Hali has not offered one scintilla of evidence to rebut this conclusion.

Moreover, even if defendant is correct in his assertion that he should have been named in the order as a "known" member of the conspiracy, *Donovan* clearly indicates that suppression is unwarranted. In denying suppression for failure to identify an individual in an intercept application, the Supreme Court observed:

Here, however, the statutorily imposed preconditions to judicial authorization were satisfied, and the issuing judge was simply unaware that additional persons might be overheard engaging in incriminating conversations. In no meaningful sense can it be said that the presence of that information as to additional targets would have precluded judicial authorization of the intercept.

*Id.* at 436, 97 S.Ct. at 672. Such analysis is no less applicable here. *See United States v. Rabstein,* 554 F.2d 190, 192 (5th Cir. 1977).

Defendant Hali next contends that, while the original wiretap orders were amended to include the crime of commercial bribery,[37] the amendments were not obtained "as soon as practicable" in violation of section 700.65(4) of the New York Criminal Procedure Law.[38] Therefore, defendant Hali concludes that all interceptions relating to commercial bribery must be suppressed as to him. The facts underlying this contention are quite simple and can be summarized briefly.

The alleged commercial bribery scheme involved efforts by the defendants to obtain funds from Dr. Emanuel Garbus to insure his son's admission into the New York College of Podiatric Medicine. A portion of

applies to the requirements of the order itself under 18 U.S.C. § 2518(4)(a). *See United States v. Kahn,* 415 U.S. 143, 152, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974).

36. Defendant Hali merely makes the conclusory statement that "the state had the requisite probable cause to know . . . that he would probably be intercepted over the phones to be 'tapped' by the I and J plants . . . ." Memorandum of Law on Behalf of Defendant Theodore Hali as to Electronic Surveillance at 4.

37. Based on conversations intercepted pursuant to the initial New York orders, Plants C, H, I and J were amended to authorize interception of conversations relating to commercial bribery and conspiracy to commit the same.

38. C.P.L. § 700.65(4) provides:

4. When a law enforcement officer, while engaged in intercepting communications in the manner authorized by this article, intercepts a communication which was not otherwise sought and which constitutes evidence of any crime that has been, is being or is about to be committed, the contents of such communications, and evidence derived therefrom, may be disclosed or used as provided in subdivisions one and two. Such contents and any evidence derived therefrom may be used under subdivision three when a justice amends the eavesdropping warrant to include such contents. The application for such amendment must be made by the applicant as soon as practicable. If the justice finds that such contents were otherwise intercepted in accordance with the provisions of this article, he may grant the application.

this fund was allegedly to be paid to parties connected with the College thereby circumventing the school's admission procedure and guaranteeing the son's admission in violation of section 180.00 of the New York Penal Law. The remainder of the fund allegedly was to be used in connection with the $100,000 Medicaid bribery fund. While intercepting conversations pursuant to the original wiretap orders, conversations relating to the commercial bribery scheme were also intercepted. The defendant's inexcusable delay contention is predicated upon a comparison of the following dates.[39]

| Plant | First Commercial Bribery Interception | Date Order Amended | Delay |
|-------|---------------------------------------|--------------------|-------|
| C | 3/ 7/76 | 4/ 6/76 | 30 days |
| H | 3/31/76 | 5/ 5/76 | 35 days |
| I | 4/ 1/76 | 4/19/76 | 18 days |
| J | 3/31/76 | 5/ 5/76 | 36 days |

Defendant Hali contends that the delays of 30, 35, 18 and 36 days respectively in obtaining the amendments failed to comply with section 700.65(4).

However, the Court must reject the defendant's contention. The basic error in defendant's claim involves a miscalculation of the date from which the delay in seeking the amendment is to be computed. It is not, as defendant claims, the date when the first conversation relating to commercial bribery was intercepted. Instead, the critical date is when "probable cause" existed for the amendment.[40] *See People v. DiStefano*, 38 N.Y.2d 640, 382 N.Y.S.2d 5, 345 N.E.2d 548 (1976). As the New York Court of Appeals stated in *DiStefano* when examining section 700.65(4):

> While it may be true that after [the first conversation] the authorities knew of defendant and even may have entertained questionable suspicions as to his plans, nevertheless, on the basis of [that] conversation alone, *the authorities lacked probable cause to seek amendment of the warrant to include either the crimes of robbery or conspiracy to rob, or to even name the defendant or his cohort.* Indeed, the police had no grounds upon which they could reasonably have asserted that defendant would use the Jimmy's Lounge telephone again. We conclude, therefore, that the [second] conversations were inadvertently overheard and, thus, were discovered in "plain view."

*Id.* 38 N.Y.2d at 649, 382 N.Y.S.2d at 10, 345 N.E.2d at 553 (emphasis supplied); *see United States v. Masciarelli*, 558 F.2d 1064, 1067 (2d Cir. 1977); *United States v. Johnson*, 176 U.S.App.D.C. 179, 539 F.2d 181, 188 & n. 26 (1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977). Once this "probable cause date" has been as-

---

**39.** Memorandum of Law on Behalf of Defendant Theodore Hali as to Electronic Surveillance at 6. Defendant Hali's memorandum indicates that April 13, 1976 was the date of the first interception over Plant H which related to the alleged commercial bribery scheme. *Id.* The government, however, alleges that the first interception occurred on March 31, 1976. Government's Memorandum In Opposition To Defendant Hali's Motion To Suppress Evidence Derived From Court Authorized Electronic Surveillance at 15. For purposes of Hali's contention, the earlier date will be utilized.

**40.** C.P.L. § 700.15 provides in pertinent part:

An eavesdropping warrant may issue only

. . . . .

2. Upon probable cause to believe that a particularly described person is committing, has committed, or is about to commit a particular designated offense; and

3. Upon probable cause to believe that particular communications concerning such offense will be obtained through eavesdropping; and

. . . . .

5. Upon probable cause to believe that the facilities from which, or the place where, the communications are to be intercepted, are being used, or are about to be used, in connection with the commission of such offense, or are to be leased to, listed in the name of, or commonly used by such person.

The federal statute contains identical provisions.

*See* 18 U.S.C. § 2518(3)(a), (b) and (d) (1970). This standard of probable cause is the same as required for a regular search warrant. *United States v. Fury*, 554 F.2d 522, 530 (2d Cir.), *cert. denied, Quinn v. U. S.*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); *United States v. Falcone*, 505 F.2d 478, 481 (3d Cir. 1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975); *People v. Kaiser*, 21 N.Y.2d 86, 286 N.Y.S.2d 801, 233 N.E.2d 818 (1967), *aff'd*, 394 U.S. 280, 89 S.Ct. 1044, 22 L.Ed.2d 274 (1969).

certained, the delay between this day and the date of the amendment must comply with the "as soon as practicable" requirement of the New York statute.[41]

With respect to the Plant C order, the first conversation ultimately deciphered to be relevant to the crime of commercial bribery occurred on March 7, 1976. On the basis of this conversation alone, however, the Court cannot say that probable cause existed for the amendment. Two additional calls were intercepted on March 16th, but, again, were insufficient to justify amendment of the Plant C order. The first conversation which began to clarify the contours of a commercial bribery scheme occurred on March 26th when the intercepted communication indicated that the defendants would "go for 5" which would be considered a "contribution" and due after "a letter of interview" was obtained. Probable cause finally attached on March 28th when the following critical conversation was intercepted:

> Murray got it straightened out with the Committee that makes the appointments. Originally they weren't going to take him, so he had to turn that around. . .

Thus, the delay between when probable cause attached and the date of the amendment was not 30 days as Hali contends but was 10 days.

With respect to Plant H, both the government and the defendant correctly consider April 13th as the critical date when probable cause attached. The delay in seeking amendment was thus 22 days. As to Plant I, the original commercial bribery interception of April 1 was too cryptic to rise to the level of probable cause. However, a series of conversations occurred on April 2 which when considered with conversations intercepted pursuant to the other orders did present sufficient facts upon which an amended order was warranted. A 17 day delay, thus, occurred before amendment of the Plant I order was sought and granted.

Finally, as to Plant J, the Court cannot agree with the defendant that a 36 day delay occurred. On March 31, 1976 a series of conversations were intercepted. However, these conversations were confusing and, at best, ambiguous and did not provide probable cause for the amendment. Probable cause did attach, however, on April 10th when the number "5" was mentioned with respect to "the kid with the medical school thing." The delay in seeking amendment was therefore only 24 days.

The respective delays in obtaining the commercial bribery amendments were thus 10 days, 22 days, 17 days and 24 days. Even the briefest review of decisional law indicates that such short delays fully comply with the "as soon as practicable" requirement of section 700.65(4) and its federal counterpart. See United States v. Vento, 533 F.2d 838 (3d Cir. 1976) (5½ month delay); United States v. Principie, 531 F.2d 1132 (2d Cir. 1976), cert. denied, 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977) (13 day delay); People v. DiStefano, supra (19 day delay); cf. United States v. Marion, 535 F.2d 697 (2d Cir. 1976) ("as soon as practicable" requirement of 18 U.S.C. § 2517(5) (1970) to be viewed "in a common-sense fashion"). Further, the orders involved herein were obtained prior to use of the

---

**41.** While the concept of probable cause is complex, courts have formulated a realistic approach to the evaluation of eavesdropping warrants and their supporting papers.

> Probable cause refers to probabilities which are the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act."

> In determining whether the applications in the instant case are sufficient to establish probable cause, we bear in mind that: "[T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the [Supreme] Court's cases are to be followed and the constitutional policy served . . . warrants . . . must be tested and interpreted . . . in a commonsense and realistic fashion." This mandate is especially relevant in the present case for, "[W]hen a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense manner."

People v. Fusco, 75 Misc.2d 981, 990, 348 N.Y. S.2d 858, 869 (Nassau Co. 1973) (emphasis added and citations omitted).

communications before the grand jury, and Hali has failed to show that he was prejudiced by the delays. *See Vento, supra* at 855; *cf. Principie, supra* at 1141–42. Accordingly, no violation of section 700.65(4) has occurred in this case.[42]

Defendant next contends that conversations intercepted pursuant to Plants C and J must be suppressed for failing to comply with the sealing requirements of section 700.50(2) of the Criminal Procedure Law and its federal counterpart 18 U.S.C. § 2518(8)(a). These provisions provide that intercepted conversations must be immediately made available to the judge issuing such order and sealed under his directions.[43] Both state and federal law, however, permit a "satisfactory explanation" to excuse literal compliance with the "immediacy" requirement. *See* 18 U.S.C. § 2518(8)(a) (1970), C.P.L. § 700.50(2). Defendant complains of a 7 day sealing delay with respect to Plant C and a 6 day delay with respect to Plant J.

Cases which have examined the sealing requirement agree that a "reasonable basis" for the delay will excuse strict compliance with the statute. They further agree that efforts to have the issuing justice seal the tapes as required by the statutes provides such a "reasonable basis." *See, e. g., United States v. Fury*, 554 F.2d 522, 533 (2d Cir.), *cert. denied, Quinn v. U. S.*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977) (6 day delay); *United States v. Gigante*, 538 F.2d 502, 506 n. 8 (2d Cir. 1976) (unexplained delay); *United States v. Poeta*, 455 F.2d 117, 122 (2d Cir.), *cert. denied*, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972) (13 day delay); *People v. Blanda*, 80 Misc.2d 79,

82–83, 362 N.Y.S.2d 735, 740–41 (Sup.Ct. 1974).[44]

The Plant C order expired on April 12, 1976 and was sealed on April 19th. As the affidavit of the supervising Assistant District Attorney Michael S. Ross indicates, 5 days delay was occasioned by the unavailability of the issuing justice. Considering this with the fact that the last two days of the delay fell on a weekend, *see Blanda, supra*, 80 Misc.2d at 82–83, 362 N.Y. S.2d at 740–41, the Court finds that the government has established a reasonable basis for the brief 7 day delay in the Plant C sealing. Plant J was terminated on April 24, 1976 and was sealed on April 29th. This six day delay was occasioned in part by the administrative need to check and inventory the tapes and in part by the brief sickness of Mr. Ross. The Court, therefore, is convinced that the Government has provided a satisfactory explanation for this brief delay. *See United States v. Sklaroff*, 506 F.2d 837, 840–41 (5th Cir.), *cert. denied*, 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975); *United States v. Caruso*, 415 F.Supp. 847, 850–51 (S.D.N.Y.1976), *aff'd mem.*, 553 F.2d 94 (2d Cir. 1977); *People v. Carter*, 81 Misc.2d 345, 349, 365 N.Y.S.2d 964, 968 (Nassau Cty. 1975); *Blanda, supra*, 80 Misc.2d at 82–83, 362 N.Y.S.2d at 740–41. In the face of these reasonable explanations, defendant Hali neither claims nor offers to prove that the tapes were tampered with or otherwise altered. Additionally, he has not shown that he was prejudiced in any way by the delays. *See Poeta, supra* at 122; *Caruso, supra* at 850. Defendant's claim is, therefore, without merit.[45]

**42.** Given this conclusion, it is unnecessary for the Court to consider the government's alternative theory that the commercial bribery interceptions were within the scope of the original wiretap orders.

**43.** In *United States v. Fury*, 554 F.2d 522, 533 (2d Cir.), *cert. denied, Quinn v. U. S.*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977), the Second Circuit held that sealing was required only after expiration of an extension order and not at the end of every 30 day period.

**44.** While a New York state court has recently ruled, contrary to the explicit wording of the

New York statute, *see* C.P.L. § 700.50(2), that any justice can authorize sealing of the intercepted communications, *People v. Pecoraro*, App.Div., 397 N.Y.S.2d 60 (2d Dept. 1977), no such authoritative ruling was in effect in April, 1976, the time when the Plant C and Plant J orders expired.

**45.** Defendant also contends that three tapes, C–64, F–28 and F–29, must be independently suppressed. This argument, however, is based on a misreading of the state amending orders. These orders clearly indicate the tapes were in fact sealed in a timely fashion, but, due to a

## DiFAZIO WIRETAP

Defendant DiFazio has raised three contentions which he argues require suppression of all or part of the intercepted communications. Initially, DiFazio claims that suppression of all intercepted communications is necessitated for failure to comply with the minimization requirements of Title 18, United States Code, Section 2518(5) and Section 700.30(7) of the New York Criminal Procedure Law.[46] These sections provide that court ordered eavesdropping be conducted in such a way as to minimize the interception of communications not within the purview of the eavesdropping order.

Initially, it must be noted that DiFazio lacks standing to challenge the improper minimization of any of the wiretaps with the exception of Plant J, as Plant J was directed to DiFazio's home telephone. See note 45 *supra.*

Notwithstanding DiFazio's standing to attack Plant J, the Court must reject his contention that it was not properly minimized. An affidavit prepared by the supervising officer of the Plant J surveillance, Sergeant Edward Siedlick, details with crystal clarity the totality of the good faith minimization efforts with regard to Plant J including the extensive instructions given to monitoring officers and a statistical analysis of the compliance with the minimization mandate. Significantly Sergeant Siedlick's affidavit indicates that a deminimus .017% of non-pertinent conversations were intercepted and recorded for more than two minutes.[47] It is clear that every reasonable effort was made to limit the interception to pertinent conversations alone. Given such efforts, the fruits of the Plant J interception are unquestionably admissible. As the Court of Appeals ruled in

clerical error, the tapes were omitted from the annexed inventory list. The amending orders merely rectified this error. The relevant amending orders state in substantially identical language:

Appearing that the sealing order contained a list of tapes C–51 through C–63 (dated April 13, 1976 to April 26, 1976) and it further

Appearing from the annexed affidavit that due to a ministerial error said list omitted the notation "C–64–April 27, 1976" and it further

Appearing from an inspection of a tape recording box marked in part, "C–64–April 27, 1976" that said box is sealed with evidence tape and contains the initials and date of sealing identical to the C–51 through C–63 tapes sealed on April 29, 1976, it is therefore

ORDERED, that the sealing order signed by Justice MARKEWICH on April 29, 1976 be amended so that the annexed and incorporated list therein of original tapes be deemed to include notation "C–64–April 27, 1976. Defendant also raises the contention that suppression of all intercepted conversations is required for failure to comply with the minimization requirements of the wiretap statutes. *See* 18 U.S.C. § 2518(5); C.P.L. § 700.30(7). Defendant, however, lacks standing to raise the issue of improper minimization. Such a right is personal to the subscriber of a subject telephone and defendant was not a subscriber to any telephone that was the subject of a wiretap order. *See Alderman v. United States,* 394 U.S. 165, 171–76, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Fury, supra* at 525–26; *Poeta, supra* at 122; *United States v. Hinton,* 543 F.2d 1002, 1011 (2d Cir. 1976), *cert. denied, United States*

*v. Cameron,* 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977).

**46.** Defendant makes the rather bald assertion that

Although the orders and amendments contained the mandatory language required by statute with regard to minimization, there is no showing by the Government of any efforts to comply with this requirement. The sheer volume of intercepted communications suggests an automatic and continuous recording operation with respect to the locations and persons named in the respective orders.

Defendant DiFazio's Memorandum of Law at 3.

**47.** A statistical analysis of all interceptions occurring over the Plant J wiretap is as follows:

| | |
|---|---|
| Number of calls intercepted | 1181 |
| Number of pertinent calls intercepted | 176 |
| (Total non-pertinent calls) | 1005 |
| Number of non-pertinent calls terminated by police officer | 735 |
| | 269 |
| Number of non-pertinent calls initially intercepted but terminated by the speaker in under two minutes | 252 |
| | 17 |
| Number of non-pertinent calls intercepted and recorded to completion i. e., longer than two minutes | 17 |

Affidavit of Sergeant Siedlick at 5. Thus out of 1005 intercepted non-pertinent conversations only 17 or .017% were not minimized.

a similar instance of state obtained wiretap evidence utilized in a federal prosecution:

> In reviewing the district court's ruling on minimization, state law must again be applied. New York, however, has interpreted its minimization provisions in light of the federal statute which goes no "further than to require that the methods used to effect minimization be in good faith and reasonable." Although the trial court's analysis of these interceptions revealed that many non-pertinent calls had been intercepted, a vast majority of these did not exceed two minutes, "too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation," especially under the circumstances of this case. Defendants asserted that the interception of any non-pertinent calls is prima facie evidence of failure to minimize, but the trial court correctly concluded that the police in this case reasonably complied, in good faith, with minimization requirements.

*United States v. Capra*, 501 F.2d 267, 275–76 (2d Cir. 1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975) (citations omitted); *see Vento, supra* at 852–53.

Additionally, since Sergeant Siedlick's affidavit discloses in detail a clear awareness of and adherence to the minimization requirement, and since DiFazio has not challenged the minimization by use of the logs, transcripts or tapes, no evidentiary hearing on his minimization claim is necessary. As the Second Circuit has held:

> The affidavits . . . supplemented by the logs and tapes were sufficient to establish a prima facie showing of compliance with the statutory minimization directive.
>
> . . . . .
>
> In the absence of any evidence that a substantial number of non-pertinent conversations had been intercepted unreasonably, the court was justified in denying appellants' suppression motions without holding a full adversary-type hearing.

*United States v. Cirillo*, 499 F.2d 872, 880–81 (2d Cir. 1974), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1975).

Like defendant Hali, DiFazio next challenges all of the wiretap authorizations for failure to name him as a person to be intercepted, or, in the alternative, he claims that each order should have been amended to include him. As to Plants A, B, D, E and G, defendant lacks standing to challenge these interceptions since he was not a subscriber of the target telephones and, in fact, was not even intercepted pursuant to these Plants.[48] Moreover, since DiFazio was named in the Plant C and Plant H extension orders and in the initial Plant I and J orders, he has no basis on which to attack these wiretap authorizations.

Thus, it is only with respect to the initial Plant C and Plant H orders that DiFazio possesses the standing to claim that he should have been named in these initial orders. For the reasons stated with respect to the identical contention of defendant Hali, *supra*, DiFazio's contention is similarly without merit.

DiFazio's contention that under the New York statute suppression is required for failure to promptly amend the orders to include him as a person to be intercepted is based on a misinterpretation of applicable New York law. As the New York Court of Appeals stated in *People v. Gnozzo*, 31 N.Y.2d 134, 335 N.Y.S.2d 257, 286 N.E.2d 706 (1972), *cert. denied*, 410 U.S. 973, 93 S.Ct. 373, 35 L.Ed.2d 610 (1973):

> Where the communication intercepted involves the crime specified in the warrant, the named suspect, and an unknown outside party, at least in this instance, the communication is "sought" and no amendment is required. . . .
> Whether an amendment is required depends on the disclosure of a different

---

**48.** Under both the state and federal statutes, only an "aggrieved person" has standing to challenge the validity of a wiretap. 18 U.S.C. § 2518(10)(a) (1970); C.P.L. § 710.20. An "aggrieved person" is one whose conversations have been intercepted during the course of a wiretap surveillance, or a person against whom a wiretap was directed. 18 U.S.C. § 2510(11); C.P.L. § 710.10(5); *see Fury, supra* at 525–26.

crime, and perhaps on other circumstances, but not against whom the communication is to be used.

*Id.* 31 N.Y.2d at 143, 335 N.Y.S.2d at 263, 286 N.E.2d at 710 (citations omitted). Thus, no immediate amendment was required and the naming of DiFazio in the extension orders satisfied the New York statute. *See United States v. Principie,* 531 F.2d 1132, 1137–38 (2d Cir. 1976), *cert. denied,* 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977); *United States v. O'Neill,* 497 F.2d 1020 (6th Cir. 1974); *United States v. Austin,* 399 F.Supp. 698 (E.D.N.Y.1975); *Gnozzo, supra.*[49] Moreover, this contention has been rejected in terms of the federal statute as well. *Principie, supra,* 531 F.2d at 1137–38.

Finally, DiFazio's claim that all of the conversations relating to the crime of commercial bribery must be suppressed for failure to comply with the "as soon as practicable" provision of C.P.L. § 700.65(4) is also denied for the reasons stated with respect to defendant Hali, *supra.*

## DeCICCO WIRETAP

DeCicco's primary contention is that the four February 20, 1976 telephone calls were illegally intercepted under the Plant C authorization and thus could not be used as a predicate to establish the probable cause required for the Plant H order.[50] Since these calls form the "touchstone of the Plant H"[51] application, defendant argues that, without them, probable cause for the Plant H authorization is lacking and that all conversations intercepted over Plant H must therefore be suppressed. In addition, DeCicco also seeks suppression of the four February 20th phone conversations.[52]

To understand defendant's suppression motion, it is necessary to briefly outline the facts upon which the motion is based. By order dated February 13, 1976, Judge Markewich of the Appellate Division, Second Department authorized the interception of certain conversations being transmitted over a telephone subscribed to by defendant John Valente. The order (hereinafter "Plant C") specifically authorized the interception of conversations "pertaining to [the state crimes of] bribery of, and bribe receiving by, a public servant and conspiracy to commit the same, being transmitted and received by John Valente . . . ."

On February 20, 1976, four telephone conversations were intercepted over the Plant C electronic surveillance. The first conversation occurred at 7:30 p. m. when a party by the name of "Joe", called the Valente

**49.** The cases of *United States v. Capra,* 501 F.2d 267 (2d Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975) and *People v. DiStefano,* 38 N.Y.2d 640, 382 N.Y. S.2d 5, 345 N.E.2d 548 (1976) are distinguishable. In each case, either the defendant or the crime intercepted was outside the scope of the wiretap authorization. In *Capra,* the wiretap order authorized the interception of conversations of a Joseph DellaValle and others. Nonetheless, the officers knowingly intercepted numerous calls of Stephen DellaCava for a 17 day period. In *DiStefano,* intercepted conversations related to the crime of robbery, but the wiretap order authorized interception of conversations relating to gambling offenses. In both cases an amended order was necessary once probable cause attached since the intercepted conversations were unrelated to the authorizing warrant. *See United States v. Austin,* 399 F.Supp. 698, 703 (E.D.N.Y.1975).

**50.** Counsel's affidavit in support of defendant's notice of motion asserts that the four conversations were all illegally intercepted and that he would refute them one by one. However, no mention is made of the 11:12 p. m. interception. The Court does not draw any conclusion from this omission. Instead, it will consider the legality of this fourth conversation along with the three earlier calls.

**51.** Government's Memorandum In Opposition To Defendant DeCicco's Motion To Suppress Evidence Derived From Court Authorized Electronic Surveillance at 8.

**52.** While defendant's motion papers and accompanying memorandum of law are somewhat confusing, it seems that defendant has also challenged the minimization procedures utilized during the wiretap as to the four February 20th phone calls. Defendant, however, lacks standing to raise this issue since he was not a subscriber of the target telephone. See note 45 *supra.* However, since defendant was intercepted over the Plant C wiretap and since the Plant H wiretap was directed at him, he has standing to challenge the validity of these taps and interceptions. See note 48 *supra.*

home. Mrs. Valente informed "Joe" that her husband was not home. "Joe" said he would call back in 20 minutes. At 7:50 p. m. "Joe" called again and spoke to defendant Valente. This conversation concerned the crimes referred to in the Plant C order. During this conversation, "Joe" told defendant Valente to have defendant DiFazio call him (Joe) when DiFazio arrived at the Valente home. At 9:57 p. m. defendant DiFazio used the Valente phone to call "Joe". This conversation also involved the crimes specified in the Plant C authorization. At 11:12 p. m., the final call took place when "Joe" again telephoned defendant Valente and discussed the alleged bribery scheme. Defendant DeCicco was later identified as the aforementioned "Joe". These four telephone conversations, together with other information, were subsequently utilized to establish probable cause for an order authorizing the interception of conversations being transmitted over a telephone utilized by defendant DeCicco. [Hereinafter Plant H].

■■■ As to the 7:50 p. m. and the 11:12 p. m. interceptions, calls two and four, there can be no doubt that they were legally intercepted pursuant to the Plant C authorization. The calls between defendant De-Cicco and defendant Valente discussed the alleged bribery scheme in detail and were thus highly relevant in establishing probable cause for the Plant H wiretap of defendant DeCicco's phone. The fact that

these were incoming calls and thus could not be used to establish probable cause that the target telephone of the Plant H wiretap would be used in furtherance of the alleged criminal activity, see 18 U.S.C. § 2518(3)(d) (1970); C.P.L. § 700.15(5), does not detract from the fact that these two calls did establish probable cause to believe that defendant DeCicco was involved in the alleged criminal activities, see 18 U.S.C. § 2518(3)(a) (1970); C.P.L. § 700.15(2), and that communications concerning the alleged offenses would be obtained through eavesdropping, see 18 U.S.C. § 2518(3)(b) (1970); C.P.L. § 700.15(3).

With respect to the 9:57 p. m. interception, the third call, DeCicco claims that this interception was unlawful as being totally outside the scope of the Plant C authorization. Specifically, defendant DeCicco contends that under the Plant C order, defendant Valente had to be a party to the conversation in order for interception to fall within the purview of the order.[53] Since Valente was not a party, DeCicco contends that the interception could not be used to establish probable cause for the Plant H order. If DeCicco is correct in his contention, then the Plant H order would be seriously deficient since this call is the basis on which the target telephone of the Plant H authorization was established.[54] See 18 U.S.C. § 2518(3)(d) (1970); C.P.L. § 700.-15(5).

---

**53.** As previously noted the Plant C wiretap order authorized interception of conversations "being transmitted and received *by* John Valente . . . ." (emphasis supplied). Relying on the Supreme Court decision in *United States v. Kahn*, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974), defendant contends that this language mandates that defendant Valente be a party to the conversation. In *Kahn* the Court stated that if the wiretap order had read "conversations *between* Irving Kahn and others", rather than "communications *of* Irving Kahn and others as yet unknown", *id.* at 156, 94 S.Ct. at 984 (emphasis in original), the order would require that Irving Kahn "be a party to every intercepted conversation," *id..* Since the order used the latter language, interception of Kahn's associates and wife was permissible even if Irving Kahn was not a party to the intercepted communication. *Id.* Based on this analysis, defendant DeCicco argues that by employing the language "*by* Joseph Valente", the

Plant C order is even more specific than the *Kahn* language of "*between* Irving Kahn", thereby necessitating that defendant Valente be a party to all intercepted communications. However, given the Court's resolution of defendant DeCicco's contention, the *Kahn* issue need not be considered.

**54.** The 9:57 p. m. call was an outgoing call. The recording and a copy were taken to a laboratory where engineers placed the copy on a machine known as the Hekimian Decoder. Through this decoder, state officials were able to establish that one of four possible telephone numbers was dialed. Affidavit of David L. Johnson at 4. Through further investigation, it was established that one of these four possible telephone numbers was being utilized by defendant DeCicco. *Id.* It is this telephone number which is the target of the Plant H wiretap order.

■ While it may be true that defendant DiFazio placed the call from defendant Valente's home, and that defendant DiFazio and defendant DeCicco were the major participants in the 9:57 p. m. call, defendant DeCicco significantly fails to note that defendant Valente was actually a party, albeit for a limited period of time, to the 9:57 p. m. telephone conversation. Moreover, it is clear that this conversation was highly relevant to the criminal activity alleged in the Plant C wiretap order. Finally, as stated in an affidavit accompanying the Plant C application, the purpose of the Plant C order was to reveal the identities of defendant Valente's confederates, the nature of the alleged illegal agreement and the methods to be employed by the alleged conspirators.[55] Since the state judge was notified of these purposes and presumably scrutinized the accompanying application and affidavits, it is apparent that by issuing the

Plant C order, Judge Markewich implicitly approved the purpose for which the order was sought. *Cf. United States v. Tortorello*, 480 F.2d 764, 783 (2d Cir. 1973), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1974). Based on the above, it is clear that the interception of the 9:57 p. m. communication was within the scope of the Plant C wiretap authorization and thus could be used as a basis for establishing probable cause for the Plant H order.[56]

■ The 7:30 p. m. interception between Mrs. Valente and defendant DeCicco, which was less than 2 minutes in duration, presents the most serious challenge as it is indisputable that defendant Valente was not a party to this call. However, even assuming that this conversation was not within the literal ambit of the Plant C order,[57] an amendment to that order was

**55.** Affidavit of Donald L. Johnson at 39.

**56.** The fact that defendant Valente was only minimally involved in the 9:57 p. m. call does not alter the Court's conclusion as to the legality of this interception. No case has been brought to the Court's attention, nor has the Court been able to find any decisions which require that the target of a wiretap order be a "substantial participant" in the communication before interception is proper. Such a conclusion would ignore the practical problems confronting the officers at the time of the investigation and the purposes for which electronic surveillance is sought. *Cf. United States v. Vento*, 533 F.2d 838, 853 (3d Cir. 1976).

**57.** It must be noted that the Court is not fully convinced that this initial phone call was outside the scope of the Plant C wiretap order. In *United States v. Johnson*, 176 U.S.App.D.C. 179, 539 F.2d 181 (1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977), the Court stated:

Officers attending a properly authorized, limited, and supervised wiretap have no obligation to close their ears to unexpected incriminating information on matters unrelated to their immediate investigation. They have a legal right to their position within electronic earshot of conversations over certain telephones within certain time limitations. Like an officer who sees contraband in plain view from a vantage point where he has a right to be, one properly overhearing unexpected villainy need not ignore such evidence.

*Id.* at 188; *see United States v. Masciarelli*, 558 F.2d 1064, 1067 (2d Cir. 1977). In a footnote the Court also rejected the contention that it is

necessary to disengage a wiretap in the midst of a properly authorized and properly conducted interception when unexpected incriminating evidence is overheard. *Johnson, supra*, 539 F.2d at 188 n. 26. Of similar import is the following statement by the New York Court of Appeals:

By enacting C.P.L. 700.65 (subd. 4) the Legislature obviously intended to engraft the "plain view" exception upon the general constitutional requirement that seized evidence must be particularly described in the application for a warrant . . . . Since eavesdropping warrants are based on substantially the same principles applicable to search warrants for physical evidence and, inasmuch as evidence not described but discovered in the course of a lawful search is under certain circumstances admissible, it seems only logical for the Legislature to have intended that intercepted communications be treated similarly.

*People v. DiStefano*, 38 N.Y.2d 640, 648, 382 N.Y.S.2d 5, 9, 345 N.E.2d 548, 552–53 (1976). The Court went on to hold that the second interception which involved a defendant who was not identified in the wiretap application or order, *id.* 38 N.Y.2d at 644, 382 N.Y.S.2d at 7, 345 N.E.2d at 550, and which involved crimes not specified in the application or order, *id.*, was intercepted in "plain view", *id.* at 649, 382 N.Y.S.2d at 10, 345 N.E.2d at 553.

Based on these cases, it is arguable that the 7:30 p. m. interception was discovered in plain view and thus within the scope of the Plant C electronic surveillance. It can not be seriously disputed that the Plant C application and order were legally obtained. Nor can it be claimed

unnecessary prior to the use of this call in establishing probable cause for the Plant H wiretap order.[58] Both the Third Circuit and the Court of Appeals for the District of Columbia have held that even without an amendment, conversations not originally within the scope of a wiretap order can provide probable cause for a subsequent eavesdropping warrant. *United States v. Johnson*, 176 U.S.App.D.C. 179, 184–85, 539 F.2d 181, 186–87 (1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977); *United States v. Vento*, 533 F.2d 838, 854–55 (3d Cir. 1976). In *Vento* the Court stated:

> Section 2517(5) distinguishes between two types of use that may be made of intercepted communications about offenses other than those specified in the original order of authorization. "Unrelated" communications may be disclosed or used without judicial authorization if such use is in conformity with subsections (1) and (2) of section 2517. Subsections (1) and (2) permit the disclosure of "unrelated" communications to other investigative officers and the use of the communications by the recipient officer "to the extent such use is appropriate to the proper performance of his official duties." On the other hand, subsections (3) and (5) require judicial approval for the disclosure of "unrelated" communications in connection with "giving testimony under oath or affirmation in any proceeding held under the authority of the United States . . . ."

The use of the narcotics data from the Gregorio tap compels the Court to inquire whether an ex parte application for a wire intercept order constitutes a "proceeding held under the authority of the United States" for the purposes of section 2517(3) and (5). We believe that it does not. The legislative history of section 2517 reveals that subsection (3) "envisions . . . the use and disclosure of such evidence at trial to establish guilt directly, or to corroborate, or to impeach a witness' testimony, or to refresh his recollection." Subsection (2), in contrast, "envisions use of the contents of intercepted communications, for example, . . . to establish probable cause to search, or to develop witnesses." Thus, Congress appears to have contemplated the employment without judicial authorization of unrelated communications to obtain search warrants.

Authorizations to intercept communications are subject to more restrictive preconditions than apply to the issuance of traditional search warrants. That difference, however, cannot dilute the principle that underlies the use and regulation of wiretaps—that a wire interception is a type of search. Subject though it may be to special restrictions, because of the peculiar dangers of invasion of privacy, the

---

that the interceptions themselves were not properly conducted. This phone call was made to the target telephone of the Plant C order, and defendant DeCicco did request to speak to defendant Valente, the person named in the order itself. DeCicco did call back at 7:50 p. m. as stated in the initial call, and the 7:50 p. m. call is clearly within the scope of the Plant C order since it discusses the crimes stated in that order. By necessary implication it is clear that the purpose of the 7:30 p. m. call was to have the conversation which actually occurred at 7:50 p. m. Moreover, defendant DeCicco does not and can not seriously dispute the import of the 7:30 p. m. call in establishing his identity. Finally, the defendant DeCicco was named in an amended order on March 12, 1976, 20 days after the February 20th interceptions. As noted with respect to defendant Hali, see text accompanying note 40 *supra*, and defendant DiFazio, see text accompanying note 48

*supra*, this delay complies with the requirements of the federal and state wiretap statutes. Thus, the plain view exception of *Johnson* and *DiStefano* seems to be applicable.

**58.** In his moving papers, the defendant relies heavily on the Second Circuit's decision in *United States v. Capra*, 501 F.2d 267 (2d Cir. 1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975). *Capra*, however, is distinguishable. First, *Capra* involved suppression of wiretaps at trial and not in reference to their use in obtaining an eavesdropping warrant. Moreover, in *Capra* the government knowingly intercepted communications involving one Stephen DellaCava for 17 days when the warrant only authorized interceptions by one Joseph DellaValle. Such a continuous and illegal course of conduct is not evident from the instant facts.

authorization to intercept should be regarded as a form of search warrant. . .

Since Congress intended subsection (2) to include applications for search warrants, it would appear, equally, that an application for a wiretap authorization was intended to fall within the ambit of subsection (2) as a "use . . . appropriate to the proper performance of . . official duties," rather than within the scope of subsection (3), which focuses on the use of wiretap evidence at trial. Hence, the Strike Force did not need a disclosure order to employ the contents of the Gregorio communications in their application to tap Vento's telephone, even though the communications in question were not related to the previously authorized hijacking investigation.

*Vento, supra* at 854–55 (footnotes omitted). Moreover, the Second Circuit in an analogous context relied on *United States v. Johnson*, 176 U.S.App.D.C. 179, 539 F.2d 181 (1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977), when it held that despite an unexplained delay in sealing, interceptions could be used to provide probable cause to support another wiretap application and order. *United States v. Fury*, 554 F.2d 522, 531–32 (2d Cir.), *cert. denied*, *Quinn v. U. S.*, 910 U.S. 433, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977).

■ Finally, with respect to the second, third and fourth interceptions, since these interceptions were within the scope of the Plant C order, immediate amendment of that order was not required and the naming of defendant in the extension order fully complied with applicable state and federal law. *See United States v. O'Neill*, 497 F.2d

1020 (6th Cir. 1974); *United States v. Austin*, 399 F.Supp. 698 (E.D.N.Y.1975); *People v. Gnozzo*, 31 N.Y.2d 134, 143, 335 N.Y.S.2d 257, 263, 286 N.E.2d 706, 710 (1972), *cert. denied*, *Zorn v. New York*, 410 U.S. 943, 93 S.Ct. 1373, 35 L.Ed.2d 610 (1973).

■ In summary, the challenged communications were properly intercepted pursuant to the Plant C order and could be utilized to establish probable cause for the Plant H order. DeCicco's contention that a Plant C amendment order was necessary prior to use of the conversation in the Plant H affidavit is similarly unavailing. Accordingly, DeCicco's motion to suppress the Plant H interceptions and the four challenged Plant C conversations is denied in all respects.[59]

### FRANK WIRETAP

By order dated February 23, 1976, electronic surveillance was authorized on defendant Frank's home telephone (hereinafter "Plant G"). Frank has moved to suppress all communications, evidence and leads obtained pursuant to this order on two grounds. He first claims that the wiretap application failed to comply with the federal and state statutes which require particularization of the crime and justification or explanation for the applicant's conclusion that probable cause exists. *See* 18 U.S.C. § 2518(1)(b) (1970); C.P.L. § 700.-20(2)(b). Secondly, Frank alleges that the wiretap application omitted material portions of the transcript of a conversation between defendant Valente and defendant Hali. Frank claims that this omission constituted a knowing and material misrepresentation of fact which requires invalidation of the eavesdropping warrant.

**59.** DeCicco also contends that the identification of his voice by Detective Johnson was an "unsubstantiated allegation". Affidavit in Support of Defendant's Notice of Motion at 7, par. 19. After having reviewed the application and supporting affidavit of Detective Johnson, the Court must reject defendant's contention. Under New York law, the identity of a person speaking over a telephone can be established by circumstantial evidence which includes evidence which makes it probable that he was the speaker. *See Dave Levine & Co. v. Wolf's*

*Package Depot*, 29 Misc.2d 1085, 1088, 138 N.Y.S.2d 427, 431 (Sup.Ct.1955), *aff'd*, 1 A.D.2d 874, 150 N.Y.S.2d 543 (1st Dept. 1956). Here such circumstantial evidence was present. *See also United States v. Capra*, 501 F.2d 267, 274–75 (2d Cir. 1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975); *City of New York v. Camp Construction Co.*, 51 Misc.2d 50, 272 N.Y.S.2d 631, 634 (Sup.Ct.1966); *Ruegg v. Fairfield Securities Corp.*, 284 App.Div. 703, 134 N.Y.S.2d 562 (1st Dept. 1954).

The essence of defendant's first argument is that the application contained neither sufficient details as to the particular offense nor an adequate statement of the facts from which the applicant could conclude that probable cause existed as to the particular offense. The Plant G application incorporated the affidavit of Detective Johnson which had been submitted in support of an earlier application to wiretap the telephone of defendant Valente (Plant C). The Plant G application also sets forth three recorded conversations, two between defendant Valente and defendant Frank and one between defendant Valente and defendant Hali. Frank argues that the Plant C affidavit of Detective Johnson only shows that evidence of the Medicaid conspiracy will be obtained by tapping the telephone of Valente. He thus concludes that the issuing judge never was informed of the crimes that allegedly were being committed by Frank over his telephone. Frank further argues that no analysis of the three conversations was included in the Plant G affidavit, and that it failed to explain how these interceptions related to the alleged Medicaid conspiracy or how they established the probable cause needed for the Plant G order.

 Defendant's argument betrays a lack of understanding of the Plant G application. Only upon the most hypertechnical examination of the Plant G papers might Frank's argument be said to have merit. In examining Frank's contention, however, the Court will not adopt such a constrained mode of analysis since a warrant must be tested and examined in a realistic and common sense manner. *See United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. Tortorello*, 480 F.2d 764, 781 (2d Cir. 1973),

*cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1974); *People v. Fusco*, 75 Misc.2d 981, 990, 348 N.Y.S.2d 858, 869 (Nassau Co.1973).

The Plant C affidavit of Detective Johnson, which was incorporated into the Plant G application, adequately describes the criminal venture under investigation. Frank apparently concedes as much.[60] The Plant G application is equally as specific as the other eavesdropping applications which Frank concedes meet the particularity requirement.[61] Moreover, the propriety of the incorporation of Detective Johnson's Plant C affidavit into the Plant G application is beyond dispute. *See, e. g., Tortorello, supra.*

The Plant G affidavit of Detective Johnson also sets forth three phone conversations which were intercepted pursuant to the Plant C eavesdropping warrant. In the first of these conversations, defendant Valente placed a call from his home telephone which was the target telephone of the Plant C order to defendant Frank's home telephone, which was the target telephone of the Plant G order. During this conversation, the alleged Medicaid conspiracy was discussed. In the second conversation, defendant Valente and defendant Frank again discussed aspects of the alleged scheme. Finally, in the third conversation, defendant Valente and defendant Hali discussed the alleged scheme and referred to defendant Frank's participation in it.[62] Further, Detective Johnson's Plant G affidavit states

> that the interception of telephonic communications will provide information which will indicate the confederates of Sy Frank, the nature of the agreement and understanding between Sy Frank, his

---

**60.** Defendant Frank states: "That the Valente application is convincing in establishing probable cause regarding the Medicaid scheme and the participation of Valente and certain other co-defendants is not at issue here". Memorandum of Law in Support of Dr. Frank's Motion For Suppression at 7.

**61.** *Id.* at 5.

**62.** Defendant contends that certain omitted portions of this third conversation reveal that defendant Frank was involved not in the Medicaid conspiracy but in some other legitimate fund raising effort and that these deleted materials indicate that the first two conversations presented in the Plant G affidavit refer only to this legitimate fund raising effort. This contention is discussed *infra*.

confederates, and the public servant and the methods, money, and location of the payment of monies to the public servant. Plant G affidavit of Detective Johnson, at 9, par. 11. That this last quoted paragraph and the information contained in the incorporated Plant C affidavit of Detective Johnson refer to the same criminal activity can not be seriously disputed.

■ Thus, considered in its entirety, the Plant G application and supporting papers adequately describe the alleged crimes that were being or were about to be committed and the extent of defendant Frank's participation in this venture. A review of these papers discloses no improper intention on the part of the state officials who sought the eavesdropping order. Certain parts of the affidavit and supporting papers adequately described the offenses being investigated and the communications to be intercepted. Other parts clearly indicated that defendant Frank was involved in this criminal activity and that communications regarding the alleged criminal venture would be intercepted over the Plant G target telephone. The particularity requirement of the Fourth Amendment and of federal and state wiretapping statutes was therefore satisfied. *See Tortorello, supra.*

■ With respect to defendant Frank's probable cause contention, little need be said. As was stated by Circuit Judge and now Chief Justice Burger in *Smith v. United States*, 123 U.S.App.D.C. 202, 358 F.2d 833 (1966), *cert. denied*, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1968):

> [p]robable cause is the sum total of layers of information and the synthesis of what the police have heard, what they knew, and what they observe as trained officers. We weigh not individual layers but the "laminated" total.

*Id.* at 837. Together with the incorporated Plant C affidavit, the Plant G affidavit provided ample probable cause to warrant issuance of the Plant G eavesdropping warrant.

■ As noted previously, defendant Frank's second ground for suppression is that the Plant G affidavit of Detective Johnson omitted material portions of the third conversation between defendant Hali and defendant Valente and, consequently, these omissions invalidate the eavesdropping warrant. These deleted portions mention a second fund raising effort, the "Stonybrook deal", as well as the alleged Medicaid conspiracy. Frank alleges that these portions were knowingly and intentionally deleted because they identified the Frank-Valente conversations as being about Stonybrook and not Medicaid. He claims that absent the omitted portions, it appears as though the parties were discussing Medicaid, but if the deleted portions were left intact, it could be seen that they were discussing Stonybrook. Relying on *United States v. Pond*, 523 F.2d 210 (2d Cir. 1975), *cert. denied*, 423 U.S. 1058, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976), and *United States v. Gonzalez*, 488 F.2d 833 (2d Cir. 1973), Frank contends that the Plant G application knowingly and intentionally presented an inaccurate and misleading picture of probable cause which thereby requires suppression of the Plant G interceptions. The Court, however, need not reach this issue since courts have long recognized that in the context of eavesdropping, an otherwise ambiguous conversation may serve as a predicate for probable cause so long as it is reasonably interpreted. *See United States v. Fury*, 554 F.2d 522, 530–31 (2d Cir.), *cert. denied*, *Quinn v. U. S.*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); *United States v. Vento*, 533 F.2d 838, 858–59 (2d Cir. 1976); *United States v. Principie*, 531 F.2d 1132, 1138–39 (2d Cir. 1976), *cert. denied*, 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977); *cf. United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. Lewis*, 556 F.2d 385 (6th Cir. 1977).

■ The Court has carefully examined the full transcript of the Valente-Hali communication and finds defendant Frank's argument without merit. While it is true that the deletions do show that two fund raising efforts were undertaken, the following portion of that conversation, which was deleted from the Plant G affidavit, indi-

cates that the two efforts were related and, significantly, that defendant Frank was involved in both fund raising projects.

Valente: yeah that's right now *I told Sy [defendant Frank] when he has guys listening not to connect the two things*

Hali: That's right

. . . . .

Valente: *and he [defendant Frank] says he's trying not too do that* buy [sic] you know guys like Chuck who know about the first deal [Medicaid] and Harry who knows about both [Medicaid and Stonybrook] they put you know they know its the same thing but Chuck doesn't know about Stonybrook [the second fund raising effort] except maybe he's found out so that's why I don't know how much these guys know.[63]

Thus, contrary to defendant Frank's contention, the deleted portions show that defendant Frank was involved in the alleged Medicaid scheme as well as the Stonybrook project. They do not indicate that the Frank-Valente communications referred only to the Stonybrook effort. Moreover, since defendant Frank was involved in two fund raising efforts, his raising of $150,000, a figure mentioned in the third conversation, or $50,000 more than needed for the alleged Medicaid conspiracy, does not show that the first two Plant G communications referred solely to Stonybrook. In fact, since a $100,000 figure was mentioned in the first Valente-Frank communication, it was quite reasonable for the state officials to conclude that this communication referred to Medicaid since that was the exact figure needed for the alleged Medicaid bribery effort. Finally, both the Government and defendant Frank concede that defendant Valente and defendant Hali clearly differentiated between the Medicaid and Stonybrook collection efforts. Both noted that the Stonybrook effort was to be referred to as either the "other deal" or the "second thing" and that the Medicaid project was to

be discussed as the "first deal" or "the deal."

The Court has compared the full transcript of the Valente-Hali communication with the part actually contained in the Plant G affidavit and is convinced that the portions in the affidavit refer only to the alleged Medicaid conspiracy. This examination also revealed that both the portions in the affidavit and the deleted parts of the Valente-Hali conversation which refer to the alleged Medicaid conspiracy are entirely consistent with the Frank-Valente communications and with other portions of the Plants C and G affidavits that discuss the alleged Medicaid conspiracy. The affiant's interpretation of this conversation and the two Valente-Frank communications was therefore entirely reasonable.

Since the Stonybrook collection effort was only a minimal part of the Valente-Hali conversation and since the Stonybrook effort was related to the alleged Medicaid conspiracy and collection effort, the Court can find no error in the deletion of the Stonybrook references in the Plant G affidavit. Furthermore, the Court finds that the affiant's use and interpretation of the three phone conversations was entirely reasonable and adequately established a proper predicate for probable cause as to defendant Frank. Therefore, defendant's second ground for suppression is also denied.

## GRAND JURY INSPECTION

Defendant DeCicco has moved for inspection of the minutes of the Grand Jury which returned the instant indictment. In general terms, DeCicco alleges that this inspection will provide proof (1) that no offense was committed by him; (2) that no competent evidence was presented which related to him upon which an indictment could be based; (3) that the essential elements of crimes charged were not established by the evidence before the Grand

---

**63.** Exhibit D to Government's Memorandum in Opposition to Defendant Frank's Motion To Suppress Evidence And Leads Obtained From A Court Authorized Wiretap On Frank's Telephone. (emphasis supplied). At another point during the third communication both Hali and Valente were concerned that problems with Chuck might seriously hinder both the Medicaid and Stonybrook projects. *Id.*

Jury; (4) that "highly suspect" evidence was presented to the Grand Jury; and (5) that the indictment is based upon evidence obtained as a result of some unspecified "official illegality." The defendant urges that these contentions either individually or in the aggregate provide sufficient grounds for inspection of the Grand Jury minutes. Defendants Frank, Glazer, Hali, Valente and DiFazio have joined in the instant motion and the arguments advanced in its support by DeCicco.

Disclosure of Grand Jury testimony is provided by Rule 6(e) of the Federal Rules of Criminal Procedure.[64] It is well established that unless a defendant presents a particularized need, claims a gross and prejudicial irregularity influencing the Grand Jury, or presents some similar compelling necessity, inspection of the Grand Jury testimony is to be denied. *United States v. Dioguardi*, 332 F.Supp. 7, 20 (S.D. N.Y.1971). Furthermore, a defendant has the significant burden of showing that a particularized need exists for the minutes which outweighs the well established policy of secrecy of Grand Jury proceedings. *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959); *see United States v. Procter & Gamble Co.*, 356 U.S. 677, 681, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); *Campbell v. Eastland*, 307 F.2d 478, 487 (5th Cir. 1962), *cert. denied*, 371 U.S. 955, 83 S.Ct. 502, 9 L.Ed.2d 502 (1963); *United States v. Gonzalez*, 38 F.R.D. 326, 328 (S.D.N.Y.1965); *United States v. Van Allen*, 28 F.R.D. 329, 335 (S.D.N.Y.1961). Since no such need was shown here, the defendant has not met this burden.

Here, without furnishing the supporting facts other than conclusionary statements, DeCicco seeks a wholesale examination of the Grand Jury proceedings.

It is well established that an indictment valid on its face and returned by a legally constituted and unbiased Grand Jury is sufficient to call for a trial on the merits. *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); *United States v. Ramsey*, 315 F.2d 199 (2d Cir.), *cert. denied*, 375 U.S. 883, 84 S.Ct. 153, 11 L.Ed.2d 113 (1963); *United States v. DeSapio*, 299 F.Supp. 436, 449 (S.D.N.Y. 1969); *United States v. Garcia*, 272 F.Supp. 286, 288 (S.D.N.Y.1967); *United States v. Crisona*, 271 F.Supp. 150, 159 (S.D.N.Y. 1967). Absent a showing of particularized need the Court will not review the sufficiency or legality of the evidence presented to the Grand Jury, *Garcia, supra* at 288, nor will the Court examine the evidence to test whether there was sufficient competent evidence to connect the defendant with the crimes charged in the indictment. *United States v. Eskow*, 279 F.Supp. 556, 558 (S.D. N.Y.1968). Furthermore, the question of whether there are facts to substantiate the charge against the defendant can be adequately tested by a motion to dismiss at the end of the government's case. *DeSapio, supra* at 449.

After reviewing DeCicco's contention, it is clear that his motion is predicated on mere conjecture and speculation as to what the Grand Jury minutes might reveal.

**64.** Rule 6(e) *as amended* provides in pertinent part:

(e) Secrecy of Proceedings and Disclosure

. . . . .

(2) Exceptions.—

(A) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury, other than its deliberations and the vote of any grand juror, may be made to—

(i) an attorney for the government for use in the performance of such attorney's duty; and

(ii) such government personnel as are deemed necessary by an attorney for the government to assist an attorney for the

government in the performance of such attorney's duty to enforce Federal criminal law.

. . . . .

(C) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made—

(i) when so directed by a court preliminarily to or in connection with a judicial proceeding; or

(ii) when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.

Such a showing is clearly not sufficient to lift the veil of secrecy surrounding Grand Jury proceedings. *United States v. Permisohn*, 339 F.Supp. 52, 55 (S.D.N.Y.1971); *Crisona, supra* at 159. There has been no showing that "without the transcript a defense would be greatly prejudiced or that without reference to it an injustice would be done." *Procter & Gamble, supra* 356 U.S. at 682, 78 S.Ct. at 986. Carte blanche and wholesale discovery and inspection of Grand Jury proceedings will not be allowed. *Id.* at 683, 78 S.Ct. 983; *Garcia, supra* at 288.

Consequently, the instant motion for examination of the Grand Jury minutes is denied. This denial is without prejudice to the defendants' right to move at trial on grounds then proper to obtain Grand Jury testimony. *See Permisohn, supra* at 55–56; *United States v. DiSalvo*, 251 F.Supp. 740, 746 (S.D.N.Y.1966).

## SEVERANCE

Defendants Frank, Glazer and Hali have all moved this Court for severance and separate trials pursuant to Rule 14 of the Federal Rules of Criminal Procedure.[65] The three defendants predicate their motions on similar grounds. First, defendants contend that they are merely peripheral defendants since only a fraction of the proof will be directed at them and, therefore, they will be substantially prejudiced by the spill over effect resulting from the flood of evidence to be received against the remaining defendants. They note that this other evidence includes references to the Dr. Garbus commercial bribery activity discussed *supra* and many interceptions containing threats and other highly inflammatory remarks, neither of which involved them or were done with their knowledge or consent. Secondly, defendants urge that

the Government will offer statements or confessions by co-defendants which will inculpate defendants Glazer, Frank and Hali without giving them an opportunity to cross-examine the co-defendant in violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Thirdly, the defendants claim that they may assert antagonistic defenses. Finally, defendants contend that it may be necessary to call some of their co-defendants as witnesses in their behalf who will refuse to testify on the basis of their Fifth Amendment privilege.

 The decision as to whether or not a severance is appropriate is left to the sound discretion of the trial court. *See, e. g., Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954); *United States v. Bernstein*, 533 F.2d 775, 789 (2d Cir.), *cert. denied*, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976); *United States v. Jenkins*, 496 F.2d 57, 68 (2d Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975); *United States v. Projansky*, 465 F.2d 123, 138 (2d Cir.), *cert. denied*, 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972); *United States v. Garber*, 413 F.2d 284, 285 (2d Cir. 1969). The burden is on the moving defendant to come forward with sufficient facts to warrant the exercise of discretion in his favor. *See United States v. Finkelstein*, 526 F.2d 517, 523–25 (2d Cir. 1975), *cert. denied*, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). This showing must indicate that the defendant "will be so severely prejudiced by a joint trial that it would in effect deny him a fair trial altogether." *United States v. Crisona*, 271 F.Supp. 150, 154 (S.D.N.Y.1967); *see United States v. Borelli*, 435 F.2d 500, 502 (2d Cir. 1970), *cert. denied*, 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971). The mere fact that a defendant stands a better

**65.** Rule 14 of the Federal Rules of Criminal Procedure provides:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or

provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at trial.

chance of acquittal at a separate trial is not sufficient to warrant a severance. *Id.; United States v. DeSapio*, 435 F.2d 272, 280 (2d Cir. 1970), *cert. denied*, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971); *Tillman v. United States*, 406 F.2d 930, 935 (5th Cir.), *vacated as to one defendant on other grounds*, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969). Instead, it is necessary to balance the prejudice to the moving defendant against the prejudice to the public interest caused by the time, expense, delay, and duplication of trials. *United States v. Wallace*, 272 F.Supp. 838, 841 (S.D.N.Y. 1967); *Crisona, supra* at 154. At this juncture, the individual defendants have failed to meet their burden of proof.

With respect to the defendants' antagonistic defense theory, at this time their contention is merely speculative. Absolutely no facts have been provided in support of this theory. *See United States v. Ricco*, 549 F.2d 264, 273–74 (2d Cir.), *cert. denied, Indiviglia v. United States*, 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977); *United States v. Johnson*, 478 F.2d 1129, 1131–32 (5th Cir. 1973); *United States v. Kahn*, 381 F.2d 824, 841 (7th Cir.), *cert. denied*, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967); *United States v. Abrams*, 29 F.R.D. 178, 181–82 (S.D.N.Y.1961), *aff'd*, 351 F.2d 942 (2d Cir. 1965), *cert. denied*, 384 U.S. 919, 86 S.Ct. 1364, 16 L.Ed.2d 440 (1966). However, the Court is cognizable that such a ground for severance may present itself in the future.

 Defendants' contention that each of them may desire to call co-defendants to testify in their behalf is also presently premature. When there is a strong probability that a co-defendant will testify in an exculpatory manner on behalf of a defendant at a separate trial, the grant of a severance as to the benefited defendant may be appropriate. *See United States v. Finkelstein*, 526 F.2d 517, 523–24 (2d Cir. 1975), *cert. denied*, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976); *United States v. Shuford*, 454 F.2d 772, 776 (4th Cir. 1971); *United States v. Echeles*, 352 F.2d 892 (7th Cir. 1965). Here, however, none of the defendants have indicated, by affidavit or otherwise, that any other co-defendant will in fact, testify on his behalf in an exculpatory or in any other manner. It is well settled that the bare contention that a defendant may desire to call a co-defendant is insufficient to warrant a severance. *See United States v. Wilson*, 500 F.2d 715, 720–21 (5th Cir. 1974), *cert. denied*, 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975); *United States v. Donner*, 497 F.2d 184, 195 (7th Cir.), *cert. denied*, 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 661 (1974); *Brown v. United States*, 126 U.S.App.D.C. 134, 375 F.2d 310, 316–17 (1966), *cert. denied*, 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967); *United States v. Kahn*, 366 F.2d 259, 263–64 (2d Cir.), *cert. denied*, 385 U.S. 948, 87 S.Ct. 324, 17 L.Ed.2d 226 (1966); *United States v. DioGuardi*, 332 F.Supp. 7, 13 (S.D.N.Y. 1971); *United States v. Kaufman*, 291 F.Supp. 451, 452–53 (S.D.N.Y.1968); *Crisona, supra* at 154–55; *United States v. Saporta*, 270 F.Supp. 183 (E.D.N.Y.1967); *United States v. Berman*, 24 F.R.D. 26 (S.D. N.Y.1959).

Defendants' contention that they are merely peripheral defendants and will be prejudiced due to a spillover effect is also insufficient to grant severance. In support of their contentions, defendants rely on *United States v. Bertolotti*, 529 F.2d 149 (2d Cir. 1975); *United States v. Branker*, 395 F.2d 881 (2d Cir. 1968), *cert. denied*, 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 573 (1969); and *United States v. Kelly*, 349 F.2d 720 (2d Cir. 1965), *cert. denied*, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966).[b] Each of these cases, however, is clearly distinguishable. *Bertolotti* involved reversal of the defendants conviction on appeal since the evidence adduced at trial proved the existence of four separate conspiracies, not one single conspiracy as was charged in the indictment. 529 F.2d 155–57. Although the Court noted that it was improper and prejudicial as to some of the defendants to admit into evidence certain highly inflammatory intercepted conversations, this was because even though the conversations may have been "probative of the Lucas rip-off, they [had] no relevance to any of the other

transactions proved at trial." *Id.* at 158. Furthermore, "[w]ith respect to at least five of the appellants, no . . . proof [connecting them with the Lucas rip-off] was ever convincingly produced." *Id.* Here, the Government has charged and will be required to prove one overall conspiracy in which defendants Frank, Glazer and Hali participated. The commercial bribery involving Dr. Garbus and the inflammatory interceptions of which defendants herein complain all are alleged to be part of and in furtherance of the alleged scheme to defraud. *See United States v. Augello*, 452 F.2d 1135, 1140 (2d Cir. 1971). Defendants reliance on *Bertolotti* is thus premature.

*Branker* involved consolidated indictments, containing 84 counts, involving 12 individuals and six co-conspirators. 395 F.2d at 883. Failure to sever as to four defendants was held to be prejudicial error. The error occurred, however, during trial and only after the conspiracy count had been dismissed, the conspiracy being the only justification for the joinder of all the defendants. *Id.* at 888–89. The Court emphasized that after said dismissal the defendants were prejudiced "in defending the charges in the substantive counts by evidence, particularly hearsay testimony, which was admissible on the conspiracy count but which could not have been used against him in a separate trial on the substantive counts." *Id.* at 888. The situation in *Kelly* was similar to that in *Branker* and again failure to sever during trial was prejudical under the peculiar circumstances of that case. 349 F.2d at 758–59. Most significantly, the Court specifically noted that no error was committed by failing to sever prior to trial. *Id.* at 759.

▮ Thus *Bertolotti, Branker* and *Kelly* do not require this Court to grant severance at this time. To the contrary, the inescapable conclusion drawn from these cases is that in conspiracy cases, and in the absence of clear evidence pointing to severance, severance may be appropriate only after the government has been put to its proof. *See United States v. Donaway*, 447 F.2d 940, 943 (9th Cir. 1971). That the moving de-

fendants now claim to be only minor defendants is of no avail since the government asserts that it will prove that these defendants played an integral role in the alleged conspiracy to defraud and that each of these defendants had knowingly enticed others to contribute to the Medicaid bribery fund. *See Crisona, supra* at 155; *cf. United States v. Aloi*, 511 F.2d 585, 598 (2d Cir.), cert. denied, 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975); *United States v. DeLarosa*, 450 F.2d 1057, 1065 (3d Cir. 1971), cert. denied, 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972); *Berman, supra* at 28–29.

▮ Defendants Frank, Glazer and Hali are charged with conspiracy to defraud the United States. The fact that each defendant may not have participated in all acts during the course of the conspiracy and that they did not know of or condone certain acts undertaken or statements made by co-defendants, is insufficient for a grant of severance. Under this conspiracy charge, defendants will be charged with each of the acts and declarations of his co-conspirators performed or stated in the course and in furtherance of the conspiracy. *See Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949); *United States v. Kessler*, 449 F.2d 1315, 1317–18 (2d Cir. 1971); *United States v. Atomic Fire Equipment Co.*, 57 F.R.D. 531, 532 (N.D.Ohio 1973); *United States v. Malinsky*, 19 F.R.D. 426, 429 (S.D.N.Y.1956).

> Therefore, the evidence relating to the defendant in isolation is less important than the evidence of the conspiracy and the evidence of the defendant and his co-conspirators.

*Atomic Fire Equipment Co., supra* at 532. Even if the defendants are implicated in only a portion of the conspiracy, the Court, at this juncture can not conclude that defendants would be so severely prejudiced to necessitate a severance. *See United States v. Goble*, 512 F.2d 458, 465–66 (6th Cir.), cert. denied, 423 U.S. 914, 96 S.Ct. 221, 46 L.Ed.2d 143 (1975); *United States v. Branan*, 457 F.2d 1062, 1066 (6th Cir. 1972); *United States v. Postma*, 242 F.2d 488, 493

(2d Cir.), cert. denied, 354 U.S. 922, 77 S.Ct. 1381, 1 L.Ed.2d 1346 (1957). Cf. United States v. Moten, 564 F.2d 620, 626–628 (2d Cir. 1977); United States v. Lebron, 222 F.2d 531, 535 (2d Cir.), cert. denied, 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774 (1955); United States v. Ong, 397 F.Supp. 385, 388 (S.D.N.Y.1975), aff'd, 541 F.2d 331 (2d Cir. 1976), cert. denied, 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977).

Defendants' final ground for severance rests on the Bruton rule. In Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme court held that in a joint trial, introduction of a confession made by one defendant, who does not testify, which contains incriminating references against a co-defendant, violates the co-defendant's right of cross examination as secured by the Sixth Amendment's confrontation clause. Thus such a statement implicating a co-defendant is not admissible unless the incriminating references can be effectively redacted.

■■■ Bruton, however, has no application where the "hearsay utterances of a defendant . . . do not inculpate a co-defendant." United States v. Lobo, 516 F.2d 883, 884 (2d Cir.), cert. denied, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975) (per curiam). Moreover, post-conspiracy statements which do not inculpate a co-defendant may be admissible against the declarant provided that proper cautionary instructions are given to the jury. See Lutwak v. United States, 344 U.S. 604, 608, 73 S.Ct. 481, 97 L.Ed. 593 (1953); United States v. Guillette, 547 F.2d 743, 755 (2d Cir. 1976). For such cautionary instructions to be ineffective under Bruton, and thus mandate a severance the extra-judicial utterances must be "clearly inculpatory" as to the defendants presently moving for severance and "vitally important to the government's case" against those defendants. See United States v. Gonzalez, 555 F.2d 308, 316 (2d Cir. 1977); United States v. Wingate, 520 F.2d 309, 313 (2d Cir. 1975), cert. denied, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976); United States ex rel. Nelson v. Follette, 430 F.2d 1055, 1057–59 (2d Cir. 1970),

cert. denied, Nelson v. Zelker, 401 U.S. 917, 91 S.Ct. 899, 27 L.Ed.2d 818 (1971).

The Court, in camera, has examined the post-conspiratorial statements which are in the government's possession. Some of these post-conspiratorial utterances make no references implicating any co-defendant. Other such statements while implicating a co-defendant can be effectively redacted. Based on this examination, the Court can not say that the statements are clearly incriminatory or vitally important to the government's case against defendants Frank, Glazer or Hali. Thus, at this juncture, cautionary instructions as to these non-incriminating statements appear sufficient to protect the defendants' rights under Bruton should these statements be offered into evidence. See, e. g., United States v. Amrep Corp., 545 F.2d 797, 800 (2d Cir. 1976) (per curiam); Wingate, supra at 313.

The motions for severance, therefore, are presently denied in all respects. The Court however is mindful of its "continuing duty at all stages of the trial to grant a severance if prejudice does appear". Schaffer v. United States, 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960). The Court simply holds that the moving defendants have failed to establish prejudice of sufficient weight as to support severance at this time.

## CONCLUSION

Based on the above, all motions of the defendants are denied in all respects. However, defendants' motions for severance and inspection of the grand jury minutes are denied with leave to renew at a later date on grounds then proper.